# United States Court of Appeals For The First Circuit

MIKHAEL EL-BAYEH,

*Plaintiff-Appellant,*

v.

MASSACHUSETTS DEPARTMENT OF STATE POLICE; MICHAEL P. SIERRA, in the individual capacity and official capacity as a uniformed member of the Massachusetts Department of State Police; COLLEEN OGILVIE, in the official capacity as Registrar of Motor Vehicles; MARIAN T. RYAN, in the official capacity as Middlesex County District Attorney; GEOFFREY NOBLE, in the official capacity as Colonel of the Massachusetts Department of State Police; JONATHAN GULLIVER, in the official capacity as Highway Administrator of the Massachusetts Department of Transportation,

*Defendants-Appellees.*

**On Appeal from United States District Court for the District of Massachusetts**
Civil Case No. 1:25-cv-10476-LTS
The Honorable Leo T. Sorokin, Judge

**BRIEF OF PLAINTIFF-APPELLANT**

Mikhael El-Bayeh
*pro se*
10 Dewey Ave
Woburn, MA 01801
Tel: (508) 789-2605
mikhael.e@gmail.com

# 1. CORPORATE DISCLOSURE STATEMENT

Appellant Mikhael El-Bayeh is a natural person and not a corporate entity. The disclosure requirements of Federal Rule of Appellate Procedure 26.1 therefore do not apply.

## 2. TABLE OF CONTENTS

1. CORPORATE DISCLOSURE STATEMENT......................................i

2. TABLE OF CONTENTS .........................................................ii

3. TABLE OF AUTHORITIES...................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.............xiv

4. JURISDICTIONAL STATEMENT ........................................1

5. STATEMENT OF ISSUES PRESENTED FOR REVIEW .................1

6. STATEMENT OF THE CASE ...............................................2

   A. Factual Background ...................................................2

      i. The Traffic Stop and Statutory Framework ...............2

      ii. The Comparators and Falsification Evidence ...........3

      iii. The Enforcement Posture..........................................5

      iv. The Speed Regulation and Fair Notice .....................5

   B. Procedural History .....................................................6

7. SUMMARY OF THE ARGUMENT ......................................8

8. ARGUMENT ....................................................................11

   A. El-Bayeh Has Stated Equal Protection Claims Against Trooper Sierra ...........................................................11

      i. Standard of Review ...................................................11

      ii. The District Court Erred by Testing Whether the Enforcement Action Was Reasonable Rather Than Whether the Classification Was Rational ...............12

iii. The Governmental-Affiliation Classification Fails at Any Level of Scrutiny ...................................................................17

iv. The District Court Erred in Concluding El-Bayeh Failed to Plausibly Allege Similarly Situated Comparators..............20

    a. Legal Standard ........................................................20

    b. The Allegations Overwhelmingly Satisfy the Comparator Showing .................................................22

        1. Discriminatory Effect...........................................22

        2. Discriminatory Purpose ........................................23

    c. The District Court's Comparator Analysis Rests on an Erroneous Framework and Impermissible Inferences.......28

        1. No Framework Advanced or Applied Below Supports Dismissal ...........................................28

        2. El-Bayeh Did Not "Squarely Concede" a Driving-Record Distinction...........................................32

        3. The District Court Misapplied the Plausibility Standard ...........................................34

v. El-Bayeh Has Independently Stated a Class-of-One Equal Protection Claim ...................................................................36

    a. Legal Standard ........................................................37

        1. The Clear-Standard Line: Sioux City Bridge, Allegheny Pittsburgh Coal, and Olech............................37

        2. The Progeny of Olech: Engquist and the Boundaries of Class-of-One Claims................................38

        3. The Warn-or-Cite Decision Falls at the Favorable Pole of Both Engquist Axes ............................................40

4. Any Animus Requirement Is Calibrated to Contexts Lacking a Clear Standard...............42

b. El-Bayeh Has Stated a Plausible Claim of Irrational Differential Treatment .......................................46

1. The Statute Squarely Supplies the Clear Standard of Uniformity for Finding Departures ...........46

2. The Disparity Is Quantifiable and Stark.......................48

3. Trooper Sierra's Own Practice Shows a Departure from § 2's Mandate...........................49

4. The Comparators' Known Governmental Affiliations Negate Any Rational Basis .........................50

B. Official-Capacity Defendants Are Not Entitled to Sovereign Immunity .................................................51

i. Standard of Review ....................................................51

ii. El-Bayeh Has Alleged an Ongoing Violation of Federal Law .......................................................52

iii. El-Bayeh Has Alleged an Anticipated Violation of Federal Law ...........................................54

iv. El-Bayeh Seeks Prospective Relief That, in Any Event, Does Not Implicate the State Treasury .................................57

v. The District Court's Sua Sponte Mitigation Rationale Fails.........................................................58

9. CONCLUSION ...............................................................63

10. CERTIFICATE OF COMPLIANCE ...............................................64

CERTIFICATE OF SERVICE...............................................65

## 3. TABLE OF AUTHORITIES

**Cases**

*Allegheny Pittsburgh Coal Co.* v. *Comm'n of Webster Cnty.*,
488 U.S. 336 (1989) ................................................................. passim

*Anthony* v. *Sundlun*,
952 F.2d 603 (1st Cir. 1991) ................................................... 23

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ................................................................ 23

*Bell* v. *Burson*,
402 U.S. 535 (1971) ................................................................ 56

*Board of Regents* v. *Roth*,
408 U.S. 564 (1972) ................................................................ 57

*Bogan* v. *City of Boston*,
489 F.3d 417 (1st Cir. 2007) .............................................. 59, 60

*Burlington Police Dep't* v. *Hagopian*,
100 Mass. App. Ct. 720, 184 N.E.3d 789 (2022) ................... 18, 50

*Burns* v. *State Police Ass'n of Mass.*,
230 F.3d 8 (1st Cir. 2000) ...................................................... 42

*Butz* v. *Glover Livestock Comm'n Co.*,
411 U.S. 182 (1973) ................................................................ 47

*Caesars Mass. Mgmt. Co.* v. *Crosby*,
778 F.3d 327 (1st Cir. 2015) .................................................. 44

*Cafeteria & Restaurant Workers* v. *McElroy*,
367 U.S. 886 (1961) ................................................................ 40

*Chavez* v. *Illinois State Police*,
251 F.3d 612 (7th Cir. 2001) ................................. 21, 29, 30, 33

*City of Cambridge* v. *Phillips*,
415 Mass. 126, 612 N.E.2d 638 (1993) ..................... 13, 18, 41, 47

*City of Cleburne* v. *Cleburne Living Ctr.*,
473 U.S. 432 (1985) ......................................................17

*City of New Orleans* v. *Dukes*,
427 U.S. 297 (1976) ......................................................15

*Cohens* v. *Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ......................................58

*Colorado River Water Conservation Dist.* v. *United States*,
424 U.S. 800 (1976) ......................................................58

*Commonwealth* v. *O'Leary*,
480 Mass. 67, 101 N.E.3d 271 (2018) ...........................48

*Commonwealth* v. *Pappas*,
384 Mass. 428, 425 N.E.2d 323 (1981) ..........................18

*Commonwealth* v. *Perry*,
15 Mass. App. Ct. 281, 444 N.E.2d 1319 (1983)............17

*Commonwealth* v. *Rodriguez*,
472 Mass. 767, 37 N.E.3d 611 (2015) ...........................12

*Conward* v. *Cambridge Sch. Comm.*,
171 F.3d 12 (1st Cir. 1999)................................21, 33, 36

*Cordi-Allen* v. *Conlon*,
494 F.3d 245 (1st Cir. 2007)..........................................44

*Cotto* v. *Campbell*,
126 F.4th 761 (1st Cir. 2025) .....................51, 53, 55, 61

*Crawford* v. *Blue*,
271 F. Supp. 3d 316 (D. Mass. 2017) ............................60

*Crawford* v. *Blue*,
No. 15-1545 (1st Cir. Oct. 14, 2016) (unpublished) .......60

*D'Angelo* v. *N.H. Sup. Ct.*,
740 F.3d 802 (1st Cir. 2014).........................................15

*Dartmouth Review* v. *Dartmouth College,*
889 F.2d 13 (1st Cir. 1989)......................................................21, 33

*Deangelis* v. *Hasbro, Inc.,*
165 F.4th 646 (1st Cir. 2026) ........................................................34

*Dep't of State Police* v. *El-Bayeh,*
106 Mass. App. Ct. 1128 (2026) (unpublished) ....................8, 54, 62

*Donovan* v. *City of Haverhill,*
311 F.3d 74 (1st Cir. 2002)............................................................23

*Edelman* v. *Jordan,*
415 U.S. 651 (1974) ..........................................................53, 55, 61

*Engquist* v. *Oregon Dep't of Agric.,*
553 U.S. 591 (2008) ............................................................. passim

*Erickson* v. *Pardus,*
551 U.S. 89 (2007) .................................................................12, 28

*Estelle* v. *Gamble,*
429 U.S. 97 (1976) .......................................................................12

*Ex parte Young,*
209 U.S. 123 (1908) .............................................................. passim

*Flowers* v. *Fiore,*
359 F.3d 24 (1st Cir. 2004)...................................................... passim

*Ford Motor Co.* v. *Department of Treasury,*
323 U.S. 459 (1945) .....................................................................61

*Garayalde-Rijos* v. *Municipality of Carolina,*
747 F.3d 15 (1st Cir. 2014)...........................................................32

*García-Catalán* v. *United States,*
734 F.3d 100 (1st Cir. 2013)........................................................35

*Georgia Railroad & Banking Co.* v. *Redwine,*
342 U.S. 299 (1952) .....................................................................52

*Gonzalez* v. *Trevino*,
602 U.S. 653 (2024) ........................................................ 33

*Grajales* v. *P.R. Ports Auth.*,
682 F.3d 40 (1st Cir. 2012)................................23, 27, 32

*Greenlaw* v. *United States*,
554 U.S. 237 (2008) ........................................................ 28

*Hayden* v. *Grayson*,
134 F.3d 449 (1st Cir. 1998)............................. 14, 22, 31

*Hess* v. *Port Auth. Trans-Hudson Corp.*,
513 U.S. 30 (1994) .......................................................... 57

*Irwin* v. *Town of Ware*,
392 Mass. 745, 467 N.E.2d 1292 (1984) ........................ 47

*Knick* v. *Township of Scott*,
588 U.S. 180 (2019) ........................................................ 60

*Leatherman* v. *Tarrant Cnty. Narcotics Intell. & Coord. Unit*,
507 U.S. 163 (1993) ........................................................ 12

*Libby* v. *Marshall*,
833 F.2d 402 (1st Cir. 1987)........................................... 57

*McDonough* v. *Anoka County*,
799 F.3d 931 (8th Cir. 2015) .......................................... 34

*McGovern* v. *State Ethics Comm'n*,
96 Mass. App. Ct. 221, 135 N.E.3d 731 (2019)............... 19

*McGuire* v. *Reilly*,
386 F.3d 45 (1st Cir. 2004)............................................. 25

*MedImmune, Inc.* v. *Genentech, Inc.*,
549 U.S. 118 (2007) ........................................................ 55

*Meléndez-García* v. *Sánchez*,
629 F.3d 25 (1st Cir. 2010)............................................. 22

*Menard* v. *CSX Transp., Inc.*,
698 F.3d 40 (1st Cir. 2012)..............................................................35

*Mendoza* v. *Strickler*,
51 F.4th 346 (9th Cir. 2022)............................................................56

*Middleborough Veterans' Outreach Ctr., Inc.* v. *Provencher*,
502 F. App'x 8 (1st Cir. 2013) (unpublished) ................................43

*Najas Realty, LLC* v. *Seekonk Water Dist.*,
821 F.3d 134 (1st Cir. 2016).......................................................43, 44

*Newton Police Ass'n* v. *Police Chief of Newton*,
63 Mass. App. Ct. 697, 828 N.E.2d 952 (2005)...................13, 17, 41

*Nordlinger* v. *Hahn*,
505 U.S. 1 (1992) ...........................................................................20

*NRA* v. *Vullo*,
602 U.S. 175 (2024) ........................................................................36

*Ocasio-Hernández* v. *Fortuño-Burset*,
640 F.3d 1 (1st Cir. 2011).................................................26, 34, 35

*Oyler* v. *Boles*,
368 U.S. 448 (1962) ..................................................................14, 31

*Pagán* v. *Calderón*,
448 F.3d 16 (1st Cir. 2006)..............................................................16

*Papasan* v. *Allain*,
478 U.S. 265 (1986) ..................................................................54, 58

*Pennhurst State Sch. & Hosp.* v. *Halderman*,
465 U.S. 89 (1984) ..........................................................................61

*Perkins* v. *Brigham & Women's Hosp.*,
78 F.3d 747 (1st Cir. 1996)..............................................................20

*Personnel Adm'r of Massachusetts* v. *Feeney*,
442 U.S. 256 (1979) ...............................................21, 22, 23, 46

*Raper* v. *Lucey*,
488 F.2d 748 (1st Cir. 1973)..................................................56

*Reeves* v. *Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ..........................................................27

*Rodríguez-Reyes* v. *Molina-Rodríguez*,
711 F.3d 49 (1st Cir. 2013)............................................12, 23

*SEC* v. *Tambone*,
597 F.3d 436 (1st Cir. 2010)..............................................12

*Sepúlveda-Villarini* v. *Dep't of Educ. of P.R.*,
628 F.3d 25 (1st Cir. 2010)................................................33

*Sioux City Bridge Co.* v. *Dakota County*,
260 U.S. 441 (1923) ...................................................passim

*Snyder* v. *Gaudet*,
756 F.3d 30 (1st Cir. 2014)............................................43, 44

*State Emps. Bargaining Agent Coal.* v. *Rowland*,
494 F.3d 71 (2d Cir. 2007)..................................................56

*Susan B. Anthony List* v. *Driehaus*,
573 U.S. 149 (2014) ..........................................................55

*Tapalian* v. *Tusino*,
377 F.3d 1 (1st Cir. 2004)..................................................20

*Town of Barnstable* v. *O'Connor*,
786 F.3d 130 (1st Cir. 2015)....................................51, 53, 58

*U.S. Dep't of Agric.* v. *Moreno*,
413 U.S. 528 (1973) ..........................................................19

*United States* v. *Armstrong*,
517 U.S. 456 (1996) ..........................................................14

*United States* v. *Brignoni-Ponce*,
422 U.S. 873 (1975) ..........................................................25

*United States* v. *Lewis,*
517 F.3d 20 (1st Cir. 2008).......................................29, 30, 31

*United States* v. *Yu,*
161 F.4th 25 (1st Cir. 2025) ...............................13, 29, 45

*Vaquería Tres Monjitas, Inc.* v. *Irizarry,*
587 F.3d 464 (1st Cir. 2009)........................................58

*Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.,*
535 U.S. 635 (2002) .......................................52, 53, 61

*Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ...........................................25

*Village of Willowbrook* v. *Olech,*
528 U.S. 562 (2000) ............................................ passim

*Wadsworth* v. *Nguyen,*
129 F.4th 38 (1st Cir. 2025) ...........................................11

*Wall* v. *King,*
206 F.2d 878 (1st Cir. 1953)........................................56

*Washington* v. *Davis,*
426 U.S. 229 (1976) ...........................................25

*Wayte* v. *United States,*
470 U.S. 598 (1985) ...............................................16, 21

*Whalen* v. *Massachusetts Trial Ct.,*
397 F.3d 19 (1st Cir. 2005)........................................58

*Whitney* v. *Worcester,*
373 Mass. 208, 366 N.E.2d 1210 (1977) .......................................47

*Whole Woman's Health* v. *Jackson,*
595 U.S. 30 (2021) ...........................................51

*Whren* v. *United States,*
517 U.S. 806 (1996) ...........................................16

*Wilson* v. *Ark. Dep't of Hum. Servs.*,
   850 F.3d 368 (8th Cir. 2017) .......................................................34

*Wojcik* v. *Mass. State Lottery Comm'n*,
   300 F.3d 92 (1st Cir. 2002).........................................................23

*Zell* v. *Ricci*,
   957 F.3d 1 (1st Cir. 2020)...................................................... 43, 44

**Statutes**

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

28 U.S.C. § 1343(a)(3) ..................................................................1

42 U.S.C. § 1983................................................................... passim

Mass. Gen. Laws ch. 175, § 113B..............................................13

Mass. Gen. Laws ch. 268, § 6A...................................................27

Mass. Gen. Laws ch. 268A, § 23(b)(2)(ii) .................................18

Mass. Gen. Laws ch. 268A, § 23(b)(3) ................................. 19, 48

Mass. Gen. Laws ch. 268A, § 27.................................................19

Mass. Gen. Laws ch. 6C, § 57A(a)..............................................13

Mass. Gen. Laws ch. 90, § 17 ....................................................15

Mass. Gen. Laws ch. 90C, § 10...................................................27

Mass. Gen. Laws ch. 90C, § 2.............................................. passim

Mass. Gen. Laws ch. 90C, § 3(A)(6)(b) ................................. 5, 55

St. 2022, c. 81, § 7 ......................................................................35

## Rules

Fed. R. App. P. 28(e) ...................................................................... 1

Fed. R. Civ. P. 12(b)(1) ................................................................ 51

Fed. R. Civ. P. 12(b)(6) ................................................... 7, 9, 11, 38

Fed. R. Civ. P. 8(a)(2) ................................................................. 12

Fed. R. Civ. P. 9(b) ..................................................................... 23

Trial Court Rule VII(c) .............................................................. 5, 55

## Regulations

211 Mass. Code Regs. § 134.02 ................................................... 13

940 Mass. Code Regs. § 37.04 ..................................................... 35

## Other Authorities

1965 Senate Doc. No. 839 ............................................................ 17

*In the Matter of Atstupenas*, No. 657 (Mass. State Ethics Comm'n,
 Disposition Agreement, Mar. 26, 2002) ...................................... 19

Rules & Regulations of the Department of State Police, Art. 5.27.3 ..... 27

# REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This appeal presents two questions on which oral argument would assist the Court. First, the equal protection claims turn on a threshold analytical distinction — between the rationality of a *classification* and the reasonableness of an *enforcement action* — that the district court collapsed. Second, the sovereign immunity ruling mischaracterizes *Cotto v. Campbell*, 126 F.4th 761 (1st Cir. 2025). *Cotto* turned on completed forfeiture proceedings with no future enforcement in view; the district court applied it to the structural inverse: a stayed assessment backed by threatened license revocation and civil contempt. Argument would allow the panel to test both rulings.

## 4. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). On December 18, 2025, the district court granted Defendants' motions to dismiss and entered a final order disposing of all claims. Doc. Nos. 53, 54.[1] This Court has jurisdiction under 28 U.S.C. § 1291. El-Bayeh timely filed his notice of appeal on January 16, 2026.

## 5. STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether the district court erred in dismissing El-Bayeh's equal protection claims against Trooper Sierra in his individual capacity, where the court tested the reasonableness of the enforcement action rather than the rationality of the classification, and where El-Bayeh identified two specific comparators who committed more egregious violations of the same statute but received warnings because of their governmental affiliations.

2.  Whether the district court erred in holding that sovereign immunity bars El-Bayeh's claims for equitable relief against

---

[1] Documents in the record are cited by name in accordance with Fed. R. App. P. 28(e) and by reference to the district court's electronic docketing system ("ECF") as "Doc. No. __"; pincites are to the page numbers in the ECF header. "AC" refers to the Amended Complaint (Doc. No. 24).

official-capacity Defendants, where the Amended Complaint alleges an ongoing and anticipated violation of federal law and the relief sought would prevent future state action, not compel payment from the state treasury.

3.  Whether the district court erred in dismissing El-Bayeh's procedural due process claim against Defendant Gulliver (Count III) without reaching its merits, solely on the sovereign immunity grounds challenged in Issue 2.

## 6.  STATEMENT OF THE CASE

### A.  Factual Background

#### i.  *The Traffic Stop and Statutory Framework*

On August 4, 2021, Trooper Michael P. Sierra of the Massachusetts State Police stopped Mikhael El-Bayeh on U.S. Route 3 in Burlington for an alleged speeding violation — 72 miles per hour ("mph") in a 55-mph zone. (AC ¶¶ 21, 23).

Under Massachusetts law, a trooper who develops probable cause of a civil motor vehicle infraction has sole discretion to issue either a written warning or a citation assessing a scheduled fine. Mass. Gen. Laws ch. 90C, § 2. The statute, known as the "no-fix" law, was enacted to

prevent favoritism in the disposition of traffic citations. A citation, once generated, is transmitted directly to the Registrar without prosecutorial review. (AC ¶¶ 90–91). Trooper Sierra chose to cite El-Bayeh and assess a $175 fine. (AC ¶¶ 27–28, 32). A citation can also trigger collateral administrative consequences. (AC ¶ 33).

El-Bayeh is a civilian with no law enforcement or governmental affiliation, and he made no representation to the contrary during the stop. (AC ¶¶ 30–31).

### ii. *The Comparators and Falsification Evidence*

Trooper Sierra was faced with the same choice in two other speeding stops. On March 30, 2022, he stopped Daniel Snow on U.S. Route 3 in Bedford for traveling 95 mph in a 55-mph zone. After illuminating a "Middlesex Sheriff's Office" patch on Snow's jacket with his flashlight, Trooper Sierra issued a written warning. (AC ¶¶ 34, 38–39, 41, 50–51).[2] On October 2, 2022, he stopped Thomas Blair on Route 2 in Littleton for traveling 86 mph in a 55-mph zone. After Trooper Sierra asked Blair where he worked and Blair responded "Lincoln Fire

---

[2] The body-worn camera footage of the Snow stop is available at https://youtu.be/C2qVqxZ4xRc. (AC ¶ 36).

Department," Trooper Sierra issued a written warning. (AC ¶¶ 63, 70–71, 77).[3]

In both stops, Trooper Sierra falsified the observed speed on the issued warning forms, recording 65 mph rather than the actual speeds of 95 and 86 mph. His personal copies, however, noted the true speeds. (AC ¶¶ 51, 54, 78, 81).

Pattern evidence drawn from Trooper Sierra's enforcement history confirms the anomaly. Of 421 speeding warnings Sierra issued between 2019 and 2024, only two — 0.48% — involved speeds 31 mph or more over the posted limit; none exceeded 33 over. The mean excess was 16 mph, consistent with El-Bayeh's alleged 17 over. (AC ¶¶ 93–98). Snow's and Blair's violations, at 40 and 31 mph over, were extreme outliers in Sierra's own practice — yet both received the more favorable disposition that El-Bayeh, at 17 mph over, was denied.

---

[3] The body-worn camera footage of the Blair stop is available at https://youtu.be/v_x2Yy2sI4I. (AC ¶ 65).

### iii. The Enforcement Posture

The assessment remains unpaid. By operation of law, payment and all collateral consequences are stayed during the pendency of El-Bayeh's appeal of the underlying citation in state court. (AC ¶¶ 195–196).

If the stay lifts and El-Bayeh does not pay within twenty days (AC ¶ 197), two enforcement mechanisms engage. First, the Registrar is required to revoke his driver's license, registration, and all related credentials (AC ¶ 199); *see* Mass. Gen. Laws ch. 90C, § 3(A)(6)(b). Second, a district court judge may issue, at the government's request or sua sponte, a complaint for civil contempt (AC ¶ 200); *see* Trial Court Rule VII(c).

### iv. The Speed Regulation and Fair Notice

The special speed regulation ("SSR") establishing the 55-mph limit on U.S. Route 3 was promulgated without a supporting traffic engineering study. (AC ¶ 134). MassDOT's internal memoranda concluded the speed limit did not conform to its own speed zoning procedures (AC ¶ 136), and in 2021 the Massachusetts Appeals Court memorialized MassDOT's concession that it must comply with those regulatory procedures when promulgating speed limits (AC ¶ 133). In

2024, however, the same court construed those procedures as discretionary guidance, not mandatory regulations — without referencing its 2021 order. (AC ¶¶ 147–149). MassDOT continues to maintain public proclamations consistent with its earlier interpretation on its website. (AC ¶¶ 154–156).

## B. Procedural History

El-Bayeh, proceeding *pro se*, filed this action on February 27, 2025, asserting claims under 42 U.S.C. § 1983. Defendant Sierra moved to dismiss on March 30, 2025 (Doc. No. 16), and the initial Commonwealth Defendants moved separately on April 3, 2025 (Doc. No. 20).

On May 19, 2025, El-Bayeh filed the operative Amended Complaint with the parties' consent. Doc. No. 24. The Amended Complaint names Trooper Sierra in his individual and official capacities and four other Commonwealth officials — Colonel Geoffrey Noble, Registrar Colleen Ogilvie, Highway Administrator Jonathan Gulliver, and Middlesex County District Attorney Marian Ryan — in their official capacities. It asserts three counts: selective enforcement (Count I) and selective prosecution (Count II) under the Equal Protection Clause, and a procedural due process claim for deprivation of fair notice (Count III).

The district court directed the Defendants either to file new responses to the Amended Complaint or to file replies applying their existing motions to dismiss. Doc. No. 28. All Defendants elected the latter course. Trooper Sierra filed his reply on May 26, 2025 (Doc. No. 29); the Commonwealth Defendants (now including Noble and Gulliver, who adopted the initial motion) filed their reply on May 29, 2025 (Doc. No. 36). On May 30, 2025, El-Bayeh moved for a preliminary injunction to stay enforcement of the citation penalties. Doc. No. 37. On June 30, 2025, El-Bayeh filed a consolidated opposition to both motions to dismiss (Doc. No. 45), and the Commonwealth Defendants filed their opposition to the preliminary injunction motion (Doc. No. 44). El-Bayeh filed his consolidated reply to the oppositions on July 14, 2025. Doc. No. 49.

On December 18, 2025, the district court (Sorokin, J.) dismissed all claims. Doc. Nos. 53, 54. The court held that sovereign immunity barred the official-capacity claims, finding the *Ex parte Young* exception inapplicable because the complaint did not allege an "ongoing violation" of federal law. Doc. No. 53 at 7–9. The court dismissed the individual-capacity equal protection claims under Rule 12(b)(6), concluding that Sierra's enforcement action survived rational basis review and that El-

Bayeh had not sufficiently alleged similarly situated comparators. Doc. No. 53 at 9–13. The court denied the preliminary injunction as moot. Count III was not addressed on the merits.

El-Bayeh timely noticed this appeal on January 16, 2026. On March 27, 2026, the Massachusetts Appeals Court reversed the affirmance of the responsible finding related to El-Bayeh's citation and remanded for vacatur. *Dep't of State Police* v. *El-Bayeh*, 106 Mass. App. Ct. 1128 (2026) (unpublished).

## 7. SUMMARY OF THE ARGUMENT

The district court dismissed El-Bayeh's equal protection claims by asking whether Trooper Sierra's enforcement action was reasonable — the wrong question. The Fourteenth Amendment asks whether a government classification is rational, not whether the enforcement action itself is rational. The impermissible classification here is governmental affiliation. Trooper Sierra cited an ordinary civilian for a speeding violation while issuing warnings to two government-affiliated motorists who committed far more egregious violations of the same speed limit on the same type of roadway.

The comparator disparity is stark. Snow, a correction officer, was traveling 40 mph over the posted limit. Blair, a firefighter, was traveling 31 mph over. El-Bayeh was allegedly traveling 17 mph over. All three were stopped by the same trooper. Sierra cited El-Bayeh, assessing a fine and triggering collateral penalties. The two government-affiliated motorists received warnings. The district court dismissed this showing by speculating that El-Bayeh's driving record might explain the disparity — drawing against El-Bayeh an inference Rule 12(b)(6) forbids.

The allegations of discriminatory purpose are equally strong. The comparators' governmental affiliations were disclosed to Sierra during their stops; El-Bayeh made no such representation. Sierra's own enforcement history confirms the inference of purpose: across 421 warnings, he routinely warned at speeds like El-Bayeh's and seldom or never at the comparators' speeds. And on both warning forms, Sierra recorded false speeds — concealing his conduct by making the warnings appear unremarkable. Falsification of official records strengthens the inference of discriminatory purpose.

The allegations independently state a class-of-one claim. Massachusetts law provides the clear standard *Olech* requires: the

governing statute declares a uniformity purpose, designates warning as the default disposition, and backs both with a "no-fix" provision targeting favoritism. Sierra's departure from that standard is objectively measurable. Where a clear standard makes departures readily assessable, no animus requirement has been imposed.

The district court separately erred in holding that sovereign immunity bars El-Bayeh's claims for equitable relief against official-capacity Defendants. The *Ex parte Young* exception applies because El-Bayeh alleges both an ongoing and an anticipated violation of federal law, and the relief he seeks is prospective. The assessment remains unpaid. If El-Bayeh does not pay, the Commonwealth will revoke his driver's license and may initiate civil contempt proceedings. This is a textbook pre-enforcement challenge: El-Bayeh seeks to prevent future constitutional deprivations, not to recover for past ones. And even if any portion of the relief were characterized as retrospective, no judgment El-Bayeh seeks would touch the Commonwealth's treasury.

The district court's central reliance on *Cotto* v. *Campbell* was misplaced: *Cotto* involved completed forfeiture proceedings with no future enforcement threatened — the structural inverse of this case. And

the court's sua sponte suggestion that El-Bayeh could avoid harm by simply paying the fine reduces to the very argument the Supreme Court rejected in *Ex parte Young* itself: submit to the allegedly unconstitutional exaction and challenge it after the fact. Capitulation to an unconstitutional demand is not the price of federal judicial review. The suggestion also forecloses its own remedy: if El-Bayeh pays, his only remaining relief is a refund, a form of retrospective monetary relief the Eleventh Amendment bars against official-capacity Defendants.

Finally, Count III, El-Bayeh's procedural due process claim against Defendant Gulliver in his official capacity, was dismissed solely on the sovereign immunity grounds challenged above, without reaching its merits. Reversal requires remand for the district court to address Count III in the first instance.

## 8. ARGUMENT

### A. El-Bayeh Has Stated Equal Protection Claims Against Trooper Sierra

#### i. *Standard of Review*

This Court reviews the district court's dismissal of El-Bayeh's claims against Trooper Sierra in his individual capacity under Rule 12(b)(6) *de novo*, *Wadsworth* v. *Nguyen*, 129 F.4th 38, 61 (1st Cir. 2025),

evaluating whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not include "detailed factual allegations," only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *SEC* v. *Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (quotations omitted). The Court "accept[s] as true all well-pleaded facts alleged in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *Rodríguez-Reyes* v. *Molina-Rodríguez*, 711 F.3d 49, 52–53 (1st Cir. 2013). No heightened pleading standard applies to claims under 42 U.S.C. § 1983. *Id.* at 53–54 (citing *Leatherman* v. *Tarrant Cnty. Narcotics Intell. & Coord. Unit*, 507 U.S. 163, 168 (1993)). "A document filed *pro se* is 'to be liberally construed.'" *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle* v. *Gamble*, 429 U.S. 97, 106 (1976)).

### ii. *The District Court Erred by Testing Whether the Enforcement Action Was Reasonable Rather Than Whether the Classification Was Rational*

The enforcement decision challenged here is a creature of statute. *Commonwealth* v. *Rodriguez*, 472 Mass. 767, 773, 37 N.E.3d 611, 616 (2015) (Mass. Gen. Laws ch. 90C, §§ 2 and 3(A) "implicitly authorize

police officers to stop motor vehicles in order to issue traffic citations"). That authority is narrow and binary: the officer has two "clearly defined, available options," a written warning or a citation. *City of Cambridge* v. *Phillips*, 415 Mass. 126, 130, 612 N.E.2d 638, 641 (1993). The law fully "divest[s] police headquarters of control over a decision that, under the statute, must be made by the officer at the scene." *Newton Police Ass'n* v. *Police Chief of Newton*, 63 Mass. App. Ct. 697, 700, 828 N.E.2d 952, 955 (2005). Under this officer-directed scheme, a favored class receives written warnings with no fine or other consequences, and a disfavored class receives citations assessing money penalties and triggering adverse collateral effects, including an entry into the violator's Merit Rating Board record.[4] See Mass. Gen. Laws ch. 6C, § 57A(a).

These officer-level enforcement decisions are subject to equal protection constraints. *United States* v. *Yu*, 161 F.4th 25, 44 (1st Cir. 2025) (holding that "courts exercise greater oversight over the decisions of law enforcement officers than those of prosecutors"); *see United States*

---

[4] These entries constitute "surchargeable incidents," which substantially increase premiums for compulsory motor vehicle liability insurance policies. *See generally* Mass. Gen. Laws ch. 175, § 113B; 211 Mass. Code Regs. § 134.02.

v. *Armstrong*, 517 U.S. 456, 464 (1996) (prosecutorial discretion, though broad, is "subject to constitutional constraints"). The government violates this constraint when it uses impermissible classifications to decide whom to sanction among similarly situated violators. *Armstrong*, 517 U.S. at 464 (quoting *Oyler* v. *Boles*, 368 U.S. 448, 456 (1962)) ("[T]he decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"); *Hayden* v. *Grayson*, 134 F.3d 449, 453 n.3 (1st Cir. 1998) ("The Equal Protection Clause safeguards not merely against such invidious classifications as race, gender and religion, but *any* arbitrary classification of persons for unfavorable governmental treatment.") (emphasis added).

The district court recognized that governmental affiliation is not a suspect class and applied rational basis review. Doc. No. 53 at 10–11. It then ran the means-ends test with the enforcement action, not the classification, as the input on the means side. The court framed the inquiry as whether "Sierra's decision to assess a fine against El-Bayeh in the circumstances as El-Bayeh describes them was rationally related" to the Commonwealth's interest in traffic safety. Doc. No. 53 at 11. It noted that Sierra stopped El-Bayeh "because [Sierra] believed [he] was driving

14

seventy-two [MPH] in a fifty-five [MPH] zone," (Doc. No. 53 at 11 (quoting AC ¶ 23)), and, citing Mass. Gen. Laws ch. 90, § 17, concluded that this "reasonably warrants a stop and a citation." Doc. No. 53 at 11. On that basis, the court found that "[s]topping a driver in those circumstances is plainly and rationally related to the Commonwealth's interest in maintaining traffic safety" and "[t]he decision to fine a motorist is just as rationally related to that interest." Doc. No. 53 at 12. The court used governmental affiliation to select the tier of review — but never subjected the classification itself to substantive analysis.

The problem with the district court's approach is that equal protection rational basis review tests the *classification*, the criterion for treating similarly situated individuals differently, against the relevant state interest. *City of New Orleans* v. *Dukes*, 427 U.S. 297, 303 (1976) (the classification must be "rationally related to a legitimate state interest"); *D'Angelo* v. *N.H. Sup. Ct.*, 740 F.3d 802, 806 (1st Cir. 2014) (classification must be "neither arbitrary, unreasonable nor irrational"). By substituting the enforcement action for the classification, the court collapsed the inquiry into something resembling a Fourth Amendment reasonableness analysis. The equal protection question is not whether

15

the plaintiff could be stopped or cited; it is why the plaintiff was cited and the comparators were not. The classification in controversy is governmental affiliation: the alleged basis Trooper Sierra used to treat similarly situated violators of the same statute differently. (AC ¶¶ 55, 82, 204–206). The Equal Protection Clause reaches executive conduct no less than legislative classifications. *Pagán* v. *Calderón*, 448 F.3d 16, 34 (1st Cir. 2006) (citing *Sioux City Bridge Co.* v. *Dakota County*, 260 U.S. 441, 445 (1923)).

Because the district court tested the enforcement action rather than the classification, it applied a framework under which no selective enforcement claim could ever succeed: in isolation, any speeding motorist could rationally be cited. But as the Supreme Court has explained, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren* v. *United States*, 517 U.S. 806, 813 (1996). The constitutional inquiry examines the "enforcement system," not the individual enforcement action. *Wayte* v. *United States*, 470 U.S. 598, 608 (1985).

### iii. The Governmental-Affiliation Classification Fails at Any Level of Scrutiny

The Equal Protection Clause prohibits "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000) (per curiam). The Commonwealth's own statutory framework supplies the benchmark for measuring whether the governmental-affiliation classification survives. *See City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985) (applying rational basis review to executive classification against the regulatory scheme's own internal logic).

The governing traffic statute, Mass. Gen. Laws ch. 90C, § 2, itself condemns the classification. The statute's "no-fix" anti-abuse provision, proposed by Governor Volpe in 1965 to eliminate the "opportunity for subsequent maneuvering or pressure" in traffic citation dispositions, *Newton Police Ass'n*, 63 Mass. App. Ct. at 699 (quoting 1965 Senate Doc. No. 839), targets the "corrupt manipulations" inherent in the enforcement process, *Commonwealth* v. *Perry*, 15 Mass. App. Ct. 281, 283, 444 N.E.2d 1319, 1321 (1983). The SJC has explained that traffic citations are "uniquely suited to manipulation and misuse," making their

"unequal and arbitrary" disposition a particular legislative concern. *Commonwealth* v. *Pappas*, 384 Mass. 428, 431, 425 N.E.2d 323, 325 (1981). In both assigning and cabining discretionary authority, the law specifically aims to thwart decisions to issue warnings "in favor of the well-connected." *Burlington Police Dep't* v. *Hagopian*, 100 Mass. App. Ct. 720, 729, 184 N.E.3d 789, 799 (2022). The SJC has upheld this officer-level discretion on the condition that it is exercised "in the absence of unfair discrimination or some other improper exercise of discretion," leaving open equal protection challenges as a distinct basis for constitutional scrutiny. *Phillips*, 415 Mass. at 129–30 & n.3.[5]

Nor is § 2 the only statute that condemns this classification. The Commonwealth's ethics law independently prohibits government employees from using their position to secure "unwarranted privileges or exemptions which are of substantial value and which are not properly available to similarly situated individuals," Mass. Gen. Laws ch. 268A, § 23(b)(2)(ii), and from even the *appearance* of favoritism based on

---

[5] El-Bayeh does not assert a freestanding state-law claim under § 1983; a state-law violation alone is insufficient to support one. The Commonwealth's statutory framework is invoked here not as an independent basis for relief, but to identify the legitimate state interest against which the classification must be measured.

"kinship, rank, position or undue influence," Mass. Gen. Laws ch. 268A, § 23(b)(3). These provisions have been enforced in precisely this context. *McGovern* v. *State Ethics Comm'n*, 96 Mass. App. Ct. 221, 222, 231, 135 N.E.3d 731, 735, 741–42 (2019) (police lieutenant violated § 23(b)(2)(ii) by declining to cite fellow officer for OUI despite probable cause); *see also In the Matter of Atstupenas*, No. 657 (Mass. State Ethics Comm'n, Disposition Agreement, Mar. 26, 2002), https://www.mass.gov/settlement/in-the-matter-of-ross-a-atstupenas (police chief directed subordinate to convert speeding citation to written warning because violator was brother of fellow officer). The Commission has also published official guidance for state employees illustrating the prohibition with a speeding-ticket example. Mass. Gen. Laws ch. 268A, § 27; Doc. No. 45-3 at 5.

The statutes speak with one voice: the classification is not just irrelevant to state interests, it is inimical to them. *See U.S. Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 534, 538 (1973) (classification "clearly irrelevant to the stated purposes" of the governing statutory scheme is "wholly without any rational basis"). It is precisely the type of "aberrational enforcement policy" the Supreme Court has differentiated from

19

legitimate legislative classifications. *Allegheny Pittsburgh Coal Co.* v. *Comm'n of Webster Cnty.*, 488 U.S. 336, 344 n.4 (1989); *see Nordlinger* v. *Hahn*, 505 U.S. 1, 16 (1992) (explaining that *Allegheny Pittsburgh* failed because the assessor's classification contradicted the state's own statutory scheme, "preclud[ing] any plausible inference" of a legitimate rationale). The Commonwealth did not intend to eradicate ticket fixing as a "professional courtesy" at police headquarters so that it could occur at the roadside instead. A policy of special favorable treatment for government-affiliated traffic violators (AC ¶¶ 204–205) fails at any level of scrutiny.

### iv. The District Court Erred in Concluding El-Bayeh Failed to Plausibly Allege Similarly Situated Comparators

#### a. Legal Standard

"[S]imilarly situated persons are to receive substantially similar treatment from their government." *Tapalian* v. *Tusino*, 377 F.3d 1, 5 (1st Cir. 2004). A claim of disparate treatment based on comparative evidence must therefore rest on proof that the proposed comparators are "similarly situated in material respects," *Perkins* v. *Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996), but the inquiry is a practical one: whether

a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." *Id.* "Reasonableness is the touchstone." *Conward* v. *Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999).

This Court has applied these principles to the treatment of motorists, holding that a plaintiff must show that he "was treated differently from similarly situated . . . motorists and that the action taken against him was motivated, at least in part, by" the impermissible classification. *Flowers* v. *Fiore*, 359 F.3d 24, 35 (1st Cir. 2004) (citing *Chavez* v. *Illinois State Police*, 251 F.3d 612, 635–36, 645 (7th Cir. 2001)). Those two requirements are *Wayte*'s prongs: discriminatory effect and discriminatory purpose. 470 U.S. at 608. The "discriminatory purpose" element is a causation inquiry: whether the challenged decision was made "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (quoting *Personnel Adm'r of Massachusetts* v. *Feeney*, 442 U.S. 256, 279 (1979)). This Court has applied the same two-prong framework to non-suspect

21

classifications. *See Hayden*, 134 F.3d at 453 & n.3 (applying *Feeney* discriminatory-purpose framework to child-victim and domestic-violence-victim classifications); *Meléndez-García* v. *Sánchez*, 629 F.3d 25, 38–39 (1st Cir. 2010) (same; identifiable group defined by organizational affiliation). El-Bayeh's allegations satisfy both prongs.

### b. *The Allegations Overwhelmingly Satisfy the Comparator Showing*

#### 1. Discriminatory Effect

Discriminatory effect requires a showing that the plaintiff was treated differently from similarly situated motorists. *Flowers*, 359 F.3d at 35. Here, the same trooper made three enforcement decisions, each disposing of a speeding violation in excess of a 55-mph speed limit on the same type of roadway. Yet the comparators, traveling at 95 and 86 mph (AC ¶¶ 41, 71), received the statutory default[6] — a warning — while El-Bayeh, at 72 mph (AC ¶ 23), received the escalated disposition. This is

---

[6] Section 2's sequential structure establishes warning as the statutory baseline. The officer "shall" record the violation and indicate "whether the citation shall constitute a written warning and, if not," which escalated disposition applies. Mass. Gen. Laws ch. 90C, § 2. The "if not" clause treats escalation as a conditional departure from the warning default. The statute's declared purpose supports this routing logic: "to create a uniform, simplified and non-criminal method for disposing of automobile law violations." *Id.*

not a case of "vague allusions to individuals treated more leniently," *Wojcik* v. *Mass. State Lottery Comm'n*, 300 F.3d 92, 105 (1st Cir. 2002), or a failure to identify specific comparators, *Donovan* v. *City of Haverhill*, 311 F.3d 74, 77 (1st Cir. 2002). The effect prong is satisfied.

### 2. Discriminatory Purpose

Conditions of a person's mind "may be alleged generally." Fed. R. Civ. P. 9(b); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 686 (2009) ("Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard."). At the pleading stage, "smoking gun" proof of discrimination is rarely available. *Grajales* v. *P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012). Nor is such proof necessary: when "'a protean issue such as an actor's motive or intent' is at stake, telltale clues may be gathered from the circumstances." *Id.* (quoting *Anthony* v. *Sundlun*, 952 F.2d 603, 605 (1st Cir. 1991)). Indeed, "[f]or pleading purposes, circumstantial evidence often suffices" to resolve such an issue. *Rodríguez-Reyes*, 711 F.3d at 56 (citing *Anthony*, 952 F.2d at 605). The inquiry is a practical one: "[w]hat a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid." *Feeney*, 442 U.S. at 279 n.24. Three categories of circumstantial

evidence support the inference that the differential treatment was motivated, at least in part, by the impermissible classification.

*First*, the allegations establish the mechanism by which the classification operated. The comparators' governmental affiliations were affirmatively disclosed to Trooper Sierra during the respective stops: Snow wore a jacket bearing a "Middlesex Sheriff's Office" patch, which Trooper Sierra illuminated with his flashlight (AC ¶ 38), and Blair identified himself as a member of the Lincoln Fire Department in response to Sierra's direct inquiry about his employment (AC ¶¶ 67, 70). By contrast, "[a]t no point during or after the traffic stop did El-Bayeh represent to Trooper Sierra or otherwise cause Trooper Sierra to believe that he was affiliated with a governmental entity." (AC ¶ 31). The district court did not address this allegation. Instead, oddly citing only AC ¶ 30, the court suggested that El-Bayeh had not alleged Sierra knew he was *not* government-affiliated. Doc. No. 53 at 4 n.6. But the classification does not require the officer to verify the motorist's non-membership in the favored class. Government employees constitute a small fraction of the general driving population; when an officer encounters an unidentified motorist, the baseline inference is that the individual is not government-

affiliated. *Cf. United States* v. *Brignoni-Ponce*, 422 U.S. 873, 886–87 (1975) (where only "a relatively small proportion" of a reference population belongs to a target group, appearance alone cannot support an inference of group membership). The policy operates through affirmative identification *into* the favored class, not through verified exclusion from it. The reasonable inference from AC ¶¶ 30–31 is the obvious one: Sierra had no reason to believe El-Bayeh was affiliated with a governmental entity.

*Second*, Trooper Sierra's own enforcement history reveals a "clear pattern, unexplainable on grounds other than" the impermissible classification. *Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see McGuire* v. *Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) (citing *Washington* v. *Davis*, 426 U.S. 229, 241–42 (1976)). Over the period examined, Trooper Sierra issued 421 written warnings for speeding; the mean speed differential was 16 mph over the limit and the median was 15. (AC ¶¶ 93, 96). El-Bayeh's alleged 17 over thus fell within Sierra's ordinary warning range, a speed he routinely warned for. (AC ¶¶ 97–98). Meanwhile, only two of the 421 warnings, or 0.48%, were issued at 31 mph over or greater, and the single highest was 33 over. (AC ¶¶ 94–

95). Snow (40 over) and Blair (31 over) were extreme outliers in Sierra's own practice. And the disparity runs in both directions: Trooper Sierra extended extraordinary leniency to government-affiliated motorists at speeds he almost never warned for, while withholding the statutory default from a civilian at a speed squarely within his ordinary warning range. The "lack of any plausible alternative justification" for this pattern supports the inference of discriminatory motivation. *See Ocasio-Hernández* v. *Fortuño-Burset*, 640 F.3d 1, 18 n.6 (1st Cir. 2011).

*Third*, the allegations show consciousness of wrongdoing. On both warnings, Trooper Sierra marked a speed of 65 mph rather than the actual 95 mph (Snow) and 86 mph (Blair). (AC ¶¶ 51–52, 78–79). His falsifications were not minor discrepancies: recording 65 in a 55 zone placed both warnings squarely in the unremarkable range of Trooper Sierra's ordinary practice, while the actual speeds — 40 and 31 mph over the limit — would have been extraordinary outliers inviting scrutiny of why warnings were issued at all. (AC ¶¶ 57, 84). These falsifications were

criminal acts,[7] and the conduct they concealed, extending warnings to government-affiliated extreme speeders, itself violated state law, *see* Part A.iii, *supra.* Such fabrication of official records strengthens the inference of discriminatory purpose. *See Grajales*, 682 F.3d at 48–50. The warning forms are Trooper Sierra's own contemporaneous account of the stops, and they are false. Where an official's documentation of a challenged decision is shown to be inaccurate, a factfinder may reasonably infer that the official was "dissembling to cover up a discriminatory purpose." *Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

The allegations establish that El-Bayeh received a different and less favorable disposition than similarly situated comparators, and that the impermissible classification motivated that treatment. The *Flowers* comparator showing is amply satisfied.

---

[7] Knowing falsification of a citation, copies thereof, or any record of issuance is a crime. Mass. Gen. Laws ch. 90C, § 10. Knowing material falsification of a written report by a public officer is a crime. Mass. Gen. Laws ch. 268, § 6A. The falsification also violated the Rules & Regulations of the Department of State Police, which independently prohibit any knowing falsification of official reports. Art. 5.27.3 (Doc. No. 45-5 at 9).

### c. The District Court's Comparator Analysis Rests on an Erroneous Framework and Impermissible Inferences

#### 1. No Framework Advanced or Applied Below Supports Dismissal

The district court's comparator analysis warrants no deference on de novo review. The analytical framework was the court's own construction: neither Sierra nor the Commonwealth cited *Lewis* or invoked the "material prosecutorial factors" test in their dispositive motions. Doc. Nos. 17, 29 (Sierra); Doc. Nos. 21, 36 (Commonwealth). El-Bayeh's preliminary injunction motion cited *Lewis* for two general propositions — the presumption of regularity attaching to official acts and the standard definition of a similarly situated comparator. Doc. No. 38 at 6, 15. The court independently extracted the "material prosecutorial factors" framework from the same case and deployed it as the basis for dismissal. Federal courts ordinarily "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw* v. *United States*, 554 U.S. 237, 243 (2008). And a *pro se* complaint is "to be liberally construed," *Erickson*, 551 U.S. at 94, not subjected to a framework more demanding than either defendant had proposed.

The *Lewis* framework, moreover, does not govern this case. *Lewis* involved a decision whether to bring federal criminal charges, a quintessentially prosecutorial judgment subject to the "presumption of regularity" that attaches to the exercise of prosecutorial discretion. *United States* v. *Lewis*, 517 F.3d 20, 25 (1st Cir. 2008). Trooper Sierra's warn-or-cite decision is categorically different. It is a noncriminal, officer-level action in which the citation operates as the final disposition and is transmitted directly to the Registrar without prosecutorial review, advocacy, or any intervening adjudicative process (AC ¶¶ 90–91); *see* Mass. Gen. Laws ch. 90C, § 2. This Court has recognized the distinction: police enforcement decisions are subject to "greater oversight" than prosecutorial charging decisions, and officers must often "justify their tactics." *Yu*, 161 F.4th at 44.[8] And this Court has already decided the comparator standard for § 1983 selective enforcement claims arising from motor vehicle stops under *Flowers*, with no mention of "material prosecutorial factors." 359 F.3d at 35 (citing *Chavez*, 251 F.3d at 635–36,

---

[8] *Yu* was decided December 11, 2025, seven days before the district court's December 18 order. The court did not cite *Yu*. Had it considered *Yu's* clarification of the enforcement–prosecution distinction, the *Lewis* prosecutorial framework would have been an unlikely analytical choice.

645). Unlike *Lewis*, *Flowers* involves the same decisional structure as this case: a police officer selecting among graduated enforcement responses during a motor vehicle stop. And even Sierra's own motion to dismiss invoked the *Flowers*/*Chavez* framework (Doc. No. 29 at 5–6), not *Lewis*. The district court bypassed both this Court's directly applicable precedent and the parties' shared analytical framework to import a more demanding and categorically inapposite standard.

Even assuming arguendo that the *Lewis* framework applies, the district court's analysis cannot be sustained. The court never configured the comparator pool that *Lewis* requires as a threshold step; it treated one factor as categorically excluding the comparators without analyzing whether that factor was material in context or how it interacted with the other indicia of similarly situated status that the complaint alleges. The scale of the error is apparent from the contrast with *Lewis* itself, which approved narrowing the comparator pool based on three independently material criteria: fifteen counts of false statements on federal firearms applications, possible links to terrorism, and a risk of violence. *Lewis*, 517 F.3d at 22–23, 26–28. The district court here relied on a single factor: one prior traffic citation from three years earlier.

The defendants' actual arguments fare no better on their own terms. Sierra argued that selective enforcement requires membership in a protected class such as race or religion. Doc. No. 17 at 8–9; Doc. No. 29 at 4–6. The Commonwealth similarly contended that El-Bayeh made "no allegation that the traffic stop was made due to his membership in a protected class." Doc. No. 44 at 12. This argument is foreclosed. The Equal Protection Clause protects against "any arbitrary classification," *Hayden*, 134 F.3d at 453 n.3; *Oyler*, 368 U.S. at 456, not merely classifications based on suspect-class membership. Governmental affiliation is exactly such a classification. And the defendants' failure to argue otherwise is significant: they never contended below that a governmental-affiliation classification *survives* rational basis review, that *Lewis* supplies the governing framework, or that El-Bayeh's driving record was *actually* Trooper Sierra's motivation for the disposition. The district court reached further than the parties who stood to benefit from such arguments.

### 2. El-Bayeh Did Not "Squarely Concede" a Driving-Record Distinction

The district court's characterization of the driving record as "squarely conceded" does not withstand scrutiny. Doc. No. 53 at 12–13. What El-Bayeh pleaded was the historical fact that a 2018 citation existed. There is a wide gap between pleading this as background and conceding its materiality to the Trooper's dispositional decision. El-Bayeh never conceded that Trooper Sierra considered his driving record, nor could he; what motivated his internal calculus is a "protean issue" not resolvable from external facts at the pleading stage. *Grajales*, 682 F.3d at 49. Even Sierra's own counsel could not make that assertion, only floating tentatively that an officer "*such as* Tpr. Sierra *may* take into account a number of factors" and that "[o]ne such factor *may be* the driving history of the offender." Doc. No. 17 at 11; Doc. No. 29 at 8 (emphasis added). Thus, the district court constructed a holding that exceeded even the defendant's own characterization. Rather than evaluate the complaint in its entirety, the court isolated a single factor and treated it as dispositive. *Garayalde-Rijos* v. *Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014) (reversing where district court "failed to read [the] complaint holistically and ignored relevant context"); *see*

*Chavez*, 251 F.3d at 636–37 (district court erroneously inferred purportedly material distinguishing factors not supported by the record).

The court's approach also demanded the kind of virtually identical comparators that the Supreme Court has rejected. *See Gonzalez* v. *Trevino*, 602 U.S. 653, 658 (2024) ("demand for virtually identical and identifiable comparators goes too far"). Three motorists stopped by the same trooper for exceeding the same speed limit on the same type of roadway are "fair congeners" under any measure. *Conward*, 171 F.3d at 20 (quoting *Dartmouth Review*, 889 F.2d at 19). Requiring El-Bayeh to affirmatively negate every conceivable distinguishing factor at the pleading stage was itself error; the complaint needed only to render the selective enforcement claim plausible, a threshold the allegations easily clear. *See Sepúlveda-Villarini* v. *Dep't of Educ. of P.R.*, 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J., sitting by designation) ("A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss.").

### 3. The District Court Misapplied the Plausibility Standard

The district court's plausibility determination was independently flawed. Even if the driving-record theory is a plausible reading of the pleadings, which El-Bayeh does not concede, "[f]erreting out the most likely reason for the [defendant's] actions is not appropriate at the pleadings stage." *Deangelis* v. *Hasbro, Inc.*, 165 F.4th 646, 655 (1st Cir. 2026) (quoting *McDonough* v. *Anoka County*, 799 F.3d 931, 946 (8th Cir. 2015)). A potential lawful explanation, where the facts are merely consistent with lawful conduct, does not render a plaintiff's theory implausible. *Id.* (citing *Wilson* v. *Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017)). Worse, the district court's driving-record theory itself rests on a chain of speculative inferences (Doc. No. 53 at 12–13): that Trooper Sierra checked El-Bayeh's record at the roadside, that any such check would have shown the specific speed of the 2018 citation rather than merely the fact of a prior infraction, and that this knowledge would have made a warning implausible — notwithstanding Trooper Sierra's extraordinary leniency toward far more extreme violators. At a minimum, each of these inferences ran in favor of the moving parties on a motion that required the opposite. *Ocasio-Hernández*, 640 F.3d at 7.

The dismissal on the driving-record theory is further undermined by information asymmetry. This Court has held that "some latitude may be appropriate" in applying the plausibility standard where "a material part of the information needed is likely to be within the defendant's control." *García-Catalán* v. *United States*, 734 F.3d 100, 104 (1st Cir. 2013) (citing *Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012)). Here, the comparators' driving records, which the district court deemed essential to the analysis, are shielded from public access under Massachusetts law. See St. 2022, c. 81, § 7; 940 Mass. Code Regs. § 37.04(12). By dismissing for failure to plead facts that the law forbids a plaintiff from accessing, the district court insulates selective enforcement claims from pleading-stage review whenever third-party driving records are deemed material. Where, as here, essential information is within the defendant's control, "it is reasonable to expect that 'modest discovery may provide the missing link.'" *García-Catalán*, 734 F.3d at 104–05 (quoting *Menard*, 698 F.3d at 45).

The dismissal also fails because the driving-record theory does not qualify as an "obvious alternative explanation" for Trooper Sierra's conduct. *Ocasio-Hernández*, 640 F.3d at 9. A court "cannot simply credit"

a defendant's asserted lawful justification as an "obvious alternative explanation" that defeats plausibility. *NRA* v. *Vullo*, 602 U.S. 175, 195 (2024). If the Supreme Court will not credit a defendant's own characterization of her conduct, *a fortiori* a district court cannot credit a theory that the defendant's counsel only floated tentatively. And even reaching the theory on its own terms, its failure to account for the falsified speeds, extraordinary leniency toward government-affiliated motorists, or the severity inversion forecloses it as an obvious alternative foothold for dismissal.

Each of these errors independently warrants reversal; the district court improperly constructed an analytical framework no party had advanced, treated a background fact as a dispositive concession, and resolved competing inferences against El-Bayeh at a stage requiring the opposite. Properly considered, the comparator allegations easily satisfy this Court's apples-to-apples standard. *Conward*, 171 F.3d at 20.

### v. El-Bayeh Has Independently Stated a Class-of-One Equal Protection Claim

The operative facts independently support a class-of-one claim under the Equal Protection Clause. A plaintiff states such a claim by

alleging "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. El-Bayeh's complaint satisfies that standard. The district court neither addressed nor acknowledged this theory, despite El-Bayeh's express invocation of *Olech* in his memorandum of law. Doc. No. 38 at 18–19.

### a. Legal Standard

#### 1. The Clear-Standard Line: Sioux City Bridge, Allegheny Pittsburgh Coal, and Olech

The class-of-one doctrine rests on a line of Supreme Court cases applying the Equal Protection Clause to a government official's quantifiable departure from a uniformity standard. In *Sioux City Bridge*, 260 U.S. at 445, a single property owner was assessed at 100% of true value while other county property was systematically assessed at 55%. In *Allegheny Pittsburgh Coal*, 488 U.S. at 341, an assessor valued recently sold property at purchase price while carrying over stale assessments for neighbors, producing taxable values 8 to 35 times higher. In *Olech*, the Court situated its holding within this line, citing both cases. 528 U.S. at 564. There, a village demanded a 33-foot easement from the

plaintiff as a condition of water-supply connection while requiring only 15 feet from similarly situated property owners, then relented and accepted 15 feet, itself confirming the standard it had departed from. *Id.* at 563. The Supreme Court then reversed the 12(b)(6) dismissal per curiam. All three cases share three salient features: (1) a standard requiring uniform treatment; (2) a government official executing a duty under that standard; and (3) a quantifiable metric against which the disparity could be objectively measured — and against which the disparity alone established the violation.

### 2. The Progeny of Olech: Engquist and the Boundaries of Class-of-One Claims

Eight years after *Olech*, the Supreme Court clarified the doctrine's domain. In *Engquist* v. *Oregon Dep't of Agric.*, 553 U.S. 591 (2008), it held that class-of-one claims do not extend to government action that "by [its] nature involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603. The case concerned public employment, where recognizing a class-of-one claim was deemed "contrary to the concept of at-will employment" as

terminations may occur "for a bad reason, or for no reason at all." *Id.* at 606.

But *Engquist* also articulated a broader principle that distinguishes between two poles of government action. At one pole lies action governed by a "clear standard against which departures, even for a single plaintiff, could be readily assessed," the pole occupied by the tax assessment cases on which *Olech* relied. *Id.* at 602. At the other pole lies action involving "subjective, individualized assessments" where "treating like individuals differently is an accepted consequence of the discretion granted," often "resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 603–04. Class-of-one claims are viable at the clear-standard pole and foreclosed where subjective, individualized assessments predominate.

*Engquist*'s analysis rested on a second, independent pillar as well, which recognized a crucial difference between the government exercising "'the power to regulate or license, as lawmaker'" and acting "'as proprietor, to manage [its] internal operation,'" holding that constitutional review is more searching in the former context. 553 U.S.

at 598 (quoting *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U.S. 886, 896 (1961)).

### 3. The Warn-or-Cite Decision Falls at the Favorable Pole of Both Engquist Axes

*Engquist* identifies two considerations that bear on whether government action is amenable to class-of-one review: the absence of "a clear standard against which departures . . . could be readily assessed," and the exercise of discretion in managing internal operations rather than regulating citizens at arm's length. 553 U.S. at 598, 602, 604. Both considerations favor review of the warn-or-cite decision.

*First*, the decision is governed by a clear standard. Mass. Gen. Laws ch. 90C, § 2 commands uniform treatment of motor vehicle violations and designates warning as the default disposition. A state trooper deciding whether to warn or cite a suspected speeder during a routine traffic stop is not engaged in "a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603. Rather, the decision is made in a few minutes on the side of the road with limited information: the observed speed, the posted limit, and the circumstances of the stop. There are no factors "difficult to articulate and quantify": no institutional apparatus, no

complex weighing of subjective factors. *Id.* at 604. Indeed, § 2 affirmatively removes any institutional apparatus: it "divest[s] police headquarters of control over a decision that, under the statute, must be made by the officer at the scene." *Newton Police Ass'n*, 63 Mass. App. Ct. at 700. The susceptibility of this dispositional decision to judicial review is further supported by *Phillips*, where the SJC left open whether it is subject to equal protection challenge. 415 Mass. at 129–30 & n.3.

To be sure, *Engquist* offered a traffic enforcement hypothetical in dicta. *Engquist* supposed "that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them," and posited that a complaint of being "singled out for no reason does not invoke the fear of improper government classification." *Id.* at 603–04. But that hypothetical involves a *selection* decision, constrained by the practical reality that "not all speeders can be stopped and ticketed." *Id.* at 604. The claims here do not challenge who Trooper Sierra stopped. They challenge his *dispositional* decision — after stopping his chosen individuals — of whether to warn or cite them. That decision involves no resource-constraint triage and, unlike the *Engquist* hypothetical, there *is* a basis upon which to

distinguish specific motorists: how far over the same speed limit each was traveling.

*Second*, the enforcement action is an exercise of sovereign regulation, not internal management. *Engquist*, 553 U.S. at 604–05. A state trooper citing a civilian motorist on a public highway is exercising regulatory authority over a member of the public, not managing internal government operations.

The dispositional decision thus falls on the favorable side of both *Engquist* axes.

### 4. Any Animus Requirement Is Calibrated to Contexts Lacking a Clear Standard

The question of whether a class-of-one claim requires a showing of animus traces to *Olech* itself. The *Olech* Court held that the plaintiff's allegations of irrational and arbitrary treatment were sufficient "quite apart from the Village's subjective motivation," expressly declining to reach the Seventh Circuit's alternative "subjective ill will" theory. 528 U.S. at 565. This Court initially described the *Olech* framework as proceeding "without regard to subjective motivation." *Burns* v. *State Police Ass'n of Mass.*, 230 F.3d 8, 12 n.4 (1st Cir. 2000). Subsequent

decisions, however, have produced what this Court has acknowledged as a divergence in its own precedent on the role of animus. *Middleborough Veterans' Outreach Ctr., Inc.* v. *Provencher*, 502 F. App'x 8, 10 n.3 (1st Cir. 2013) (unpublished). No panel has definitively resolved it in the thirteen years since. But the post-*Middleborough* decisions that have invoked an animus requirement share two telling features: every one involves a context lacking a clear standard against which the decision could be measured, and every one uses qualifying language. *Snyder* v. *Gaudet*, 756 F.3d 30, 34 (1st Cir. 2014) ("[i]n claims such as Snyder's") (discretionary zoning enforcement); *Najas Realty, LLC* v. *Seekonk Water Dist.*, 821 F.3d 134, 144 (1st Cir. 2016) ("[b]ased on how the plaintiffs have pled the claim") (land-use opposition); *Zell* v. *Ricci*, 957 F.3d 1, 13 (1st Cir. 2020) ("[i]n light of Zell's claim") (school discipline). These are the markers of gatekeeping calibrated to the nature of the discretion at issue, not a categorical rule.

The variable is epistemic: how faithfully can a reviewing court reconstruct the basis for the decision from the record? At one end of the spectrum, *Engquist* forecloses class-of-one claims entirely where the challenged action rests on "a vast array of subjective, individualized

43

assessments." 553 U.S. at 603; *see Caesars Mass. Mgmt. Co.* v. *Crosby*, 778 F.3d 327, 336–37 (1st Cir. 2015) (applying *Engquist* bar to casino licensing). In the middle range, such as zoning, land-use, and school discipline, the governing standards lack the precision to permit ready assessment. For these, this Court has supplemented the *Olech* framework with additional gatekeeping tools calibrated to the opacity of the particular decision. Sometimes that tool is animus. *Snyder*, 756 F.3d at 34; *Najas Realty*, 821 F.3d at 144; *Zell*, 957 F.3d at 13. Sometimes it is heightened comparator precision — "particular rigor" and an "extremely high degree of similarity." *Cordi-Allen* v. *Conlon*, 494 F.3d 245, 251 (1st Cir. 2007). But these are alternative epistemic routes, not cumulative requirements. *Cordi-Allen* expressly reserved whether animus is required, *id.* at 250 n.3, while treating it merely as a variable that relaxes the comparator standard, *id.* at 251 n.4. *Najas Realty* confirmed the fungibility: because the plaintiffs failed to show animus, the court declined to relax the comparator standard. 821 F.3d at 144 n.14. By contrast, at the clear-standard pole, where *Olech* itself arose, no supplementary gatekeeping is needed. The numbers either show a

departure or they do not. *Allegheny Pittsburgh Coal*, 488 U.S. at 341; *Sioux City Bridge*, 260 U.S. at 445.

Section 2 supplies what the middle range lacks: a determinate uniformity benchmark against which departures are readily assessed. The animus overlay has no work to do where the standard is clear and the departure objectively measurable. And unlike the middle-range categories, street-level decisionmaking by police officers is routinely scrutinized by judges without special deference. *See Yu*, 161 F.4th at 44.

Moreover, the objective *Olech* test is not merely sufficient here; it is necessary. The discrimination alleged in this case operates through institutional affinity, not personal hostility. Trooper Sierra extended favorable treatment to government-affiliated motorists, not because he harbored ill will toward El-Bayeh, but because the comparators' affiliation triggered a "professional courtesy" he did not extend to unaffiliated civilians. A subjective animus standard is structurally incapable of reaching this species of discrimination, because in-group favoritism does not register as malice to the people practicing it. The *Olech* framework reaches it by asking the right question: not whether the officer wanted to harm the plaintiff, but whether the differential

treatment had any rational basis. *Cf. Feeney*, 442 U.S. at 279 n.24 ("[w]hat a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid").

### b. *El-Bayeh Has Stated a Plausible Claim of Irrational Differential Treatment*

The challenged government action, the decision whether to warn or cite a motorist under Mass. Gen. Laws ch. 90C, § 2, is not "based on a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603. It is the execution of a mandatory-duty statute whose express legislative purpose is uniformity, whose structure designates warning as the default disposition, and whose limited residual discretion is closely regulated by the no-fix law.

### 1. The Statute Squarely Supplies the Clear Standard of Uniformity for Finding Departures

Section 2's sequential structure, warning as the statutory baseline and escalation as a departure, see *supra* note 6, embodies a declared legislative purpose of "a uniform, simplified and non-criminal method for disposing of automobile law violations." Mass. Gen. Laws ch. 90C, § 2. Section 2's uniformity declaration provides the "clear standard against which departures, even for a single plaintiff, could be readily assessed."

*Engquist*, 553 U.S. at 602; *cf. Butz* v. *Glover Livestock Comm'n Co.*, 411 U.S. 182, 186–87 (1973) (rejecting uniformity-of-sanctions argument because no such requirement existed in the governing act). In *Sioux City Bridge*, the Supreme Court enforced a state law uniformity requirement — even though the remedy violated the governing valuation standard — holding uniformity to be "the just and ultimate purpose of the law." 260 U.S. at 446. Here, the Court need not go that far: the equal treatment El-Bayeh seeks is effectively § 2's own default disposition.

The SJC's treatment of § 2 further supports its suitability as the clear-standard benchmark. In *Irwin* v. *Town of Ware*, 392 Mass. 745, 753, 467 N.E.2d 1292, 1298–99 (1984), the court recognized that § 2 reflects a legislative policy choice that the officer executes, not a "high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning" (quoting *Whitney* v. *Worcester*, 373 Mass. 208, 218, 366 N.E.2d 1210, 1216 (1977)). And in *Phillips*, the SJC characterized the warn-or-cite decision as one where "the range of clearly defined, available options is as narrow as it is in this case," juxtaposing it against the "wide ranges of discretion" that prosecutors exercise. 415 Mass. at 130.

Moreover, the no-fix law expressly regulates the limited discretion conferred: rather than accepting differential treatment as a natural consequence of officer discretion, the legislature identified differential treatment as the problem and passed the no-fix law to address it. See Part A.iii, *supra*. Indeed, the statute itself contemplates judicial oversight: procedural noncompliance with § 2 results in mandatory dismissal. *Commonwealth* v. *O'Leary*, 480 Mass. 67, 70, 101 N.E.3d 271, 274 (2018). The objectivity and workability of the standard finds still more support in the Commonwealth's ethics law, which assesses improper favoritism from the perspective of "a reasonable person, having knowledge of the relevant circumstances." Mass. Gen. Laws ch. 268A, § 23(b)(3).

### 2. The Disparity Is Quantifiable and Stark

Miles per hour over the posted limit provides a metric every bit as objective and quantifiable as the tax assessments in *Sioux City Bridge* (100% versus 55%) and *Allegheny Pittsburgh Coal* (8 to 35 times comparable neighbors), and the easement footage in *Olech* (33 feet versus 15). El-Bayeh, at 17 over, was cited; Snow, at 40 over, and Blair, at 31

over, were warned. No subjective judgment is needed to assess the disparity because the numbers show it.

### 3. Trooper Sierra's Own Practice Shows a Departure from § 2's Mandate

Trooper Sierra's own enforcement history, across several hundred issued warnings, reveals how he has operationalized § 2's uniformity mandate within his residual discretion and supplies an empirical baseline for assessing departure. The AC alleges that a speed of 17 over fell at approximately the mean of his warning distribution (AC ¶¶ 93–96) — that is, a speed he routinely warned for — while he seldom or never warned at the speeds of the comparators. In *Allegheny Pittsburgh Coal*, the Supreme Court found an equal protection violation where the county assessor's practice, though theoretically sound, in reality failed to deliver the uniform treatment it needed to produce. 488 U.S. at 343–44. Sierra's practice of warning at lower speeds and citing at higher is theoretically sound as an implementation of § 2's uniformity mandate, but achieves that goal only if applied evenly across similarly situated motorists. Here, the comparators at 40 and 31 over received warnings while El-Bayeh at

49

17 over was cited, an inversion and an inconsistency that no legitimate factor can explain.

### 4. The Comparators' Known Governmental Affiliations Negate Any Rational Basis

Both comparators are government employees, a correction officer and a firefighter, whose occupations were known to Trooper Sierra at the respective scenes. The only explanation the record supports for Sierra's treatment of the comparators versus El-Bayeh is their governmental affiliation. A carve-out within Sierra's own otherwise defensible practice (extraordinary leniency only for the government-affiliated) is precisely the discretion "in favor of the well-connected" that the no-fix law denies. *Hagopian*, 100 Mass. App. Ct. at 729. *Allegheny Pittsburgh Coal* condemned an "aberrational enforcement policy" not authorized by state law. 488 U.S. at 344 & n.4. The no-fix law goes further: Massachusetts has affirmatively prohibited this carve-out.

In sum, the AC plausibly alleges intentional differential treatment of similarly situated persons — motorists exceeding the same speed limit

on the same type of roadway — with no rational basis for the difference. That is all *Olech* requires.[9]

### B. Official-Capacity Defendants Are Not Entitled to Sovereign Immunity

#### i. *Standard of Review*

This Court reviews the district court's dismissal of El-Bayeh's claims against official-capacity defendants based on sovereign immunity under Rule 12(b)(1) *de novo*. *Town of Barnstable* v. *O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015); *Cotto* v. *Campbell*, 126 F.4th 761, 767 (1st Cir. 2025). In doing so, the Court takes all well-pleaded allegations as true and gives El-Bayeh the benefit of all reasonable inferences. *Barnstable*, 786 F.3d at 138; *see Whole Woman's Health* v. *Jackson*, 595 U.S. 30, 45–46 (2021) (sovereign immunity did not bar suit "at the motion to dismiss stage" where complaint alleged ongoing violation by officials vested with enforcement authority).

Under *Ex parte Young*, sovereign immunity does not bar suit against a state official where the plaintiff alleges an ongoing violation of

_____

[9] The official-capacity claims against Trooper Sierra were effectively dismissed on the sovereign immunity grounds challenged in Part B. Reversal of that ruling restores those claims as well.

federal law and seeks prospective relief. *Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). This is a "straightforward inquiry" that does not reach the merits. *Id.* at 645–46. El-Bayeh satisfies both prongs.

### ii. *El-Bayeh Has Alleged an Ongoing Violation of Federal Law*

In *Verizon*, the Supreme Court held that a prayer to restrain state officials from enforcing an order in contravention of controlling federal law "clearly satisfies" the straightforward inquiry. 535 U.S. at 645. The *Verizon* Court acknowledged that declaratory relief would address "the past, as well as the future, ineffectiveness of the Commission's action," but held this permissible because no past liability of the state was at issue. *Id.* at 646. That is this case. El-Bayeh alleges that official-capacity Defendants seek to enforce a state-imposed assessment he contends is unconstitutional. The assessment remains unpaid, and El-Bayeh properly seeks equitable relief to bar collection. *See also Georgia Railroad & Banking Co.* v. *Redwine*, 342 U.S. 299, 305 (1952) (holding suit to enjoin threatened collection of allegedly unconstitutional exaction "is not barred as an unconsented suit against the State").

The district court's central reliance on *Cotto* is misplaced. In *Cotto*, the plaintiffs challenged civil forfeiture proceedings that had concluded years earlier; the state had already seized their property, and the only available remedy was a return of funds from the state treasury — the paradigm of retrospective monetary relief the Eleventh Amendment forbids. *See Edelman* v. *Jordan*, 415 U.S. 651, 668–69 (1974) (federal court order directing state to pay funds to individual plaintiffs constitutes retroactive award barred by Eleventh Amendment); *Cotto*, 126 F.4th at 768–70. El-Bayeh's case is the structural inverse: the Commonwealth has not seized his property but is demanding that he surrender it, and the relief sought would prevent a future deposit into the state treasury, not compel a withdrawal from it. *Verizon*, 535 U.S. at 646.

The district court concluded otherwise because "the fine . . . was assessed in the past." Doc. No. 53 at 8. This Court has squarely rejected that reasoning, holding that "most unconstitutional agency determinations will have occurred in the past by the time a lawsuit is brought." *Town of Barnstable*, 786 F.3d at 141. The assessment is that

determination: it fixes a live debt El-Bayeh owes to the government.[10]

Because El-Bayeh challenges the present force of that obligation rather than seeking compensation for a past wrong, the claim is "precisely the type of continuing violation for which a remedy may permissibly be fashioned" under *Ex parte Young*. *Papasan* v. *Allain*, 478 U.S. 265, 281–82 (1986).

### iii. El-Bayeh Has Alleged an Anticipated Violation of Federal Law

The first prong is independently satisfied because El-Bayeh brings a pre-enforcement challenge to the enforcement mechanisms that stand behind the stayed assessment.[11] As this Court has recognized, *Ex parte Young* encompasses pre-enforcement challenges alleging "anticipated (as opposed to an ongoing) violation[s] of federal law, against state officials

---

[10] In its opposition to El-Bayeh's preliminary injunction motion, the Commonwealth failed to distinguish between assessment and collection. *See* Doc. No. 44 at 7 n.4. The assessment is complete; the Commonwealth's demand that El-Bayeh pay it is not. El-Bayeh's motion argued that *because* post-payment relief would be retrospective, pre-payment injunctive relief is the only available vehicle under *Ex parte Young*. Doc. No. 38 at 26–27. That is not a concession; it is the argument.

[11] The Massachusetts Appeals Court has reversed the affirmance of the responsible finding and remanded for vacatur. *Dep't of State Police* v. *El-Bayeh*, 106 Mass. App. Ct. 1128 (2026) (unpublished).

with the authority to prevent those violations." *Cotto*, 126 F.4th at 767 n.3. That prong was unavailable in *Cotto* because the forfeiture proceedings had concluded with no future enforcement threatened. *See* 126 F.4th at 768–70. El-Bayeh's case is the reverse. The assessment is a stayed demand; the enforcement has not yet occurred. If El-Bayeh does not pay, the Commonwealth will revoke his license and may initiate civil contempt proceedings, *see* Mass. Gen. Laws ch. 90C, § 3(A)(6)(b); Trial Court Rule VII(c) — allegations the district court itself credited. Doc. No. 53 at 9. This situation mirrors *Ex parte Young* itself, where the Attorney General was enjoined from enforcing penalties for noncompliance with a state demand. *Ex parte Young*, 209 U.S. 123, 155–56 (1908); *see Edelman*, 415 U.S. at 667.

Nothing excepts this case from the general rule: "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis in original); *see also Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158–61 (2014) (pre-enforcement challenge to penal statute; unanimous).

Moreover, this Court has long held that constitutional protections attach to the *threatened* deprivation of a driver's license, holding that "it makes no difference whether the threatened state deprivation will result from the loss of an operator's license, or from the failure to have one issued." *Raper* v. *Lucey*, 488 F.2d 748, 752 (1st Cir. 1973). El-Bayeh faces precisely that threat to his federally protected interest,[12] which he may vindicate through pre-enforcement challenge.

Indeed, if the license revocation were carried out, El-Bayeh could return to federal court and seek injunctive reinstatement — prospective equitable relief that "fit[s] comfortably within the *Ex parte Young* doctrine." *Mendoza* v. *Strickler*, 51 F.4th 346, 352–53 (9th Cir. 2022). Every circuit to have considered the issue has held that reinstatement to previous employment satisfies *Ex parte Young*, *State Emps. Bargaining Agent Coal.* v. *Rowland*, 494 F.3d 71, 96 (2d Cir. 2007) (collecting cases), and this Court has recognized a driver's license as an equivalent government-conferred legal status, *Raper*, 488 F.2d at 752 (citing *Board*

---

[12] *See Bell* v. *Burson*, 402 U.S. 535, 539 (1971) (recognizing constitutionally protected interest where "continued possession [of driver's license] may become essential in the pursuit of a livelihood"); *Raper*, 488 F.2d at 752, quoting *Wall* v. *King*, 206 F.2d 878, 882 (1st Cir. 1953) (same).

*of Regents* v. *Roth*, 408 U.S. 564 (1972)). The district court's approach does not conserve judicial resources or avoid federal adjudication. Rather, it merely requires El-Bayeh to needlessly suffer the constitutional deprivation first, then bring the same claim against Defendants who are subject to suit now.

### iv. *El-Bayeh Seeks Prospective Relief That, in Any Event, Does Not Implicate the State Treasury*

The Eleventh Amendment's "impetus" is "the prevention of federal-court judgments that must be paid out of a State's treasury," and the "vast majority of Circuits" have "generally accorded this factor dispositive weight." *Hess* v. *Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48–49 (1994) (cleaned up). This Circuit concurs: the Amendment's prohibitions engage only when the state treasury is forced to satisfy a compensatory judgment. *Libby* v. *Marshall*, 833 F.2d 402, 406 (1st Cir. 1987).

El-Bayeh seeks nothing from the state treasury; his requested relief would prevent the collection of an unconstitutional assessment — money flowing to the Commonwealth, not from it. Whether the requested relief is characterized as prospective or retrospective, no judgment El-Bayeh seeks would touch the Commonwealth's treasury, and the Eleventh

Amendment therefore does not shield official-capacity Defendants. *Vaquería Tres Monjitas, Inc.* v. *Irizarry*, 587 F.3d 464, 478–79 (1st Cir. 2009) (holding Eleventh Amendment's prohibition against retrospective relief inapplicable where no state funds implicated).

The relief El-Bayeh seeks also "serves directly to bring an end to a present violation of federal law." *Whalen* v. *Massachusetts Trial Ct.*, 397 F.3d 19, 29 (1st Cir. 2005) (quoting *Papasan*, 478 U.S. at 278). Barring collection of the unconstitutional assessment would end the violation at its source and prevent the collateral penalties that flow from nonpayment, properly "avoiding damages that [El-Bayeh] ha[s] yet to incur." *Town of Barnstable*, 786 F.3d at 140.

### v. *The District Court's Sua Sponte Mitigation Rationale Fails*

Where jurisdiction exists, federal courts have a "virtually unflagging obligation" to exercise it. *Colorado River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817–18 (1976). A federal court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). The district court's mitigation rationale — advanced sua

sponte, without support from either defendant — is irreconcilable with its obligation.

According to the district court, El-Bayeh "may avoid license suspension or contempt *by paying the fine.*" Doc. No. 53 at 9 (emphasis in original). And if El-Bayeh were to then prevail on the merits, he could recover the fine "as a part of his damages." *Id.* This theory is unsupported. The district court's sole authority, *Bogan* v. *City of Boston*, 489 F.3d 417, 428 (1st Cir. 2007), is inapt: it addresses the duty to mitigate compensatory damages once a § 1983 violation has been established, a principle governing the calculation of a damages award, not the availability of equitable relief. The order also cites no authority for the proposition that the speculative availability of a damages remedy against a different defendant forecloses equitable relief. *See* Doc. No. 53 at 9.

The district court's reasoning reduces to the very argument the Supreme Court rejected in *Ex parte Young* itself: submit to the exaction and challenge its constitutionality after the fact, an approach that closes the courthouse doors to those seeking to vindicate their constitutional rights. 209 U.S. at 147–48. The severe collateral consequences of

nonpayment (license revocation and potential incarceration) are enough to coerce compliance regardless of the assessment's constitutionality, replicating the very dynamic *Ex parte Young* addressed. In short, capitulation to an unconstitutional demand is not the price of federal judicial review. If § 1983 does not even require exhaustion of state remedies, *Knick* v. *Township of Scott*, 588 U.S. 180, 185 (2019); *accord Bogan*, 489 F.3d at 428 (holding that § 1983 claim "ripened immediately following the City's wrongful conduct"), then *a fortiori* it does not require capitulation. Indeed, a federal court in this district has already adjudicated a CMVI-related constitutional dispute by declaring a feature of the underlying statutory procedure unconstitutional. *See Crawford* v. *Blue*, 271 F. Supp. 3d 316, 321–23, 331 (D. Mass. 2017). The court did not require the plaintiff to pay first.[13]

The district court's suggestion is not merely wrong — its own logic forecloses the remedy it promises. If El-Bayeh pays the assessment, his only remaining remedy is a refund: retrospective monetary relief that the

---

[13] This Court had vacated the district court's initial summary judgment for defendants in *Crawford* as "too summary" and directed closer examination of the constitutional claim. *Crawford* v. *Blue*, No. 15-1545 (1st Cir. Oct. 14, 2016) (unpublished).

Eleventh Amendment bars against official-capacity defendants. *See Edelman*, 415 U.S. at 668–69 (citing *Ford Motor Co.* v. *Department of Treasury*, 323 U.S. 459, 464 (1945) (relief for taxpayer who paid allegedly unconstitutional tax under protest barred by Eleventh Amendment)). The district court's advice thus asks El-Bayeh to surrender prospective equitable relief for the precise form of retrospective relief the Eleventh Amendment forbids. *See Cotto*, 126 F.4th at 771. The Commonwealth's pleadings below laid out the same trap: if El-Bayeh pays, "his relief would be limited to compensation, thus removing him from *Ex parte Young* territory," Doc. No. 44 at 7 n.4; if he does not, his claim is barred as a "discrete event that occurred in the past," Doc. No. 36 at 5. Either way, no federal remedy. *Ex parte Young* thwarts that trap: the doctrine works to "permit the federal courts to vindicate federal rights." *Pennhurst State Sch. & Hosp.* v. *Halderman*, 465 U.S. 89, 105 (1984).

The district court's sua sponte suggestion did not emerge from the *Ex parte Young* framework. It emerged from the court's opinion on the underlying merits — an inquiry *Verizon* holds that framework does not include. 535 U.S. at 646. The order's factual recitation makes this plain. The court drew the inference that El-Bayeh was stopped "the day after"

the Supreme Judicial Court denied further appellate review of his challenge to the Route 3 speed limit, and, twice in footnotes, that El-Bayeh "has never conceded he was speeding." Doc. No. 53 at 2 & nn.2–3. These inferences have no bearing on the straightforward inquiry, which does not reach a plaintiff's "storied history." Doc. No. 53 at 1. A court's view of a plaintiff's disagreements with the government,[14] however firmly held, is not a basis for declining to exercise jurisdiction that *Ex parte Young* confers and *Colorado River* requires.

Finally, the district court's sovereign immunity ruling also swept away Count III, El-Bayeh's procedural due process claim against Defendant Gulliver in his official capacity (AC ¶¶ 214–219), without reaching its merits. Doc. No. 53 at 9. Because Count III was dismissed solely on jurisdictional grounds, reversal of the sovereign immunity ruling requires remand for the district court to address Count III in the first instance.

---

[14] Far from frivolous, El-Bayeh's challenge to the speed limit on U.S. Route 3 was partially vindicated when MassDOT itself raised it to sixty-five mph in response to his litigation. (AC ¶¶ 157, 159). The underlying citation has not fared better: the Appeals Court has since overturned the finding of responsibility. *Dep't of State Police*, 106 Mass. App. Ct. 1128.

## 9. CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings consistent with this Court's opinion.

Respectfully Submitted,

/s/ Mikhael El-Bayeh

Mikhael El-Bayeh
*pro se*
10 Dewey Ave
Woburn, MA 01801
(508) 789-2605
mikhael.e@gmail.com

Date: April 20, 2026

## 10. CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies as follows:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 11,905 words, as counted by the word-count function of Microsoft Word.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: April 20, 2026

/s/ Mikhael El-Bayeh

Mikhael El-Bayeh
*pro se*

# CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I electronically filed the foregoing Brief of Plaintiff-Appellant with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 20, 2026

/s/ Mikhael El-Bayeh

Mikhael El-Bayeh
*pro se*

No. 26-1067

# United States Court of Appeals
# For The First Circuit

MIKHAEL EL-BAYEH,

*Plaintiff-Appellant,*

v.

MASSACHUSETTS DEPARTMENT OF STATE POLICE, *et al.,*

*Defendants-Appellees.*

**ADDENDUM TO BRIEF OF PLAINTIFF-APPELLANT**

# TABLE OF CONTENTS

Memorandum and Order on Motions to Dismiss (Doc. No. 53)...............1

Judgment (Doc. No. 54) ...................................................................14

Statutes, Rules & Regulations..............................................................15

    Mass. Gen. Laws ch. 90C, § 2 .......................................................16

    Mass. Gen. Laws ch. 90C, § 3 .......................................................21

    Mass. Gen. Laws ch. 90C, § 10 .....................................................30

    Mass. Gen. Laws ch. 268, § 6A .....................................................31

    Mass. Gen. Laws ch. 268A, § 23 ...................................................32

    940 Mass. Code Regs. § 37.04(1), (12)–(13)......................................34

    St. 2022, c. 81, § 7 .......................................................................36

    Trial Court Rule VII .....................................................................38

Unpublished Decisions .......................................................................44

    *Crawford* v. *Blue*, No. 15-1545 .......................................................45

    *Dep't of State Police* v. *El-Bayeh*, 106 Mass. App. Ct. 1128 ..............49

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MIKHAEL EL-BAYEH, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 25-10476-LTS |
| MASSACHUSETTS DEPARTMENT OF STATE POLICE et al., | ) ) ) | |
| Defendants. | ) ) ) | |

ORDER ON MOTIONS TO DISMISS (DOC. NOS. 16, 20)

December 18, 2025

SOROKIN, J.

Mikhael El-Bayeh, representing himself, initiated this proceeding after he was stopped and ticketed for speeding by Trooper Michael P. Sierra. The defendants have moved to dismiss for lack of subject-matter jurisdiction, for failure to state a claim, and under the doctrine of res judicata. Doc. Nos. 16, 20, 29, 36.[1] El-Bayeh opposes dismissal and has separately moved for a preliminary injunction. Doc. Nos. 37, 45. The motions are ripe, and for the reasons that follow, the defendants' motions to dismiss are ALLOWED. El-Bayeh's motion for preliminary injunction is thus DENIED as moot.

I.    BACKGROUND

El-Bayeh has a storied history with a stretch of U.S. Route 3 running through Burlington, Massachusetts. On July 26, 2018, he was stopped on this road by the Massachusetts State Police

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header. The operative complaint is available at Doc. No. 24.

Add. 1

("MSP") and issued a citation that alleged "a single violation for speeding, 96 miles per hour ["MPH"] in a 55 [MPH] zone."[2]  Doc. No. 24-9 ¶ 89.  El-Bayeh contested this citation in the Woburn District Court, but he was found responsible.  Id. ¶ 90.  He exhausted all appellate avenues, to no avail.  Id. ¶¶ 90–94; see also Dep't of State Police v. El-Bayeh, 163 N.E.3d 1040 (Table) (Mass. App. Ct. 2021).  Meanwhile, El-Bayeh filed a complaint against MassDOT and MSP in the Suffolk County Superior Court on June 21, 2019, challenging the legality of the speed limit on U.S. Route 3.  Doc. No. 24 ¶¶ 120–122; see Doc. No. 24-1.  The Superior Court dismissed El-Bayeh's claims on February 3, 2020, and he again exhausted all avenues for appeal without success.  Id. ¶¶ 124–125; see Doc. No. 24-2; El-Bayeh v. Mass. Dep't of Transp., 168 N.E.3d 372 (Table) (Mass. App. Ct. 2021), appeal denied, 171 N.E.3d 721 (Table) (Mass. 2021).

On August 4, 2021, the day after the Supreme Judicial Court ("SJC") denied El-Bayeh's motion to reconsider his application for further appellate review in his challenge to the Route 3 speed limit, El-Bayeh was stopped by Sierra on the same stretch of road, allegedly driving seventy-two MPH.[3]  Doc. No. 24 ¶¶ 21, 23.  Sierra charged El-Bayeh with a speeding offense and assessed a fine of $175, payable within twenty days.  Id. ¶¶ 28, 32.  El-Bayeh appealed the citation to the Woburn District Court on August 23, 2021, and a magistrate judge found El-Bayeh responsible but reduced the fine to $105.  Id. ¶¶ 170, 173; Doc. No. 24-9 ¶¶ 164–166.  El-Bayeh then appealed to the Massachusetts Appeals Court ("MAC"), which granted a stay in the case until January 10, 2025, for El-Bayeh to litigate his concurrent suit described below.  Doc. No. 24 ¶¶ 173, 176–182.  His fine remains unpaid.

---

[2] El-Bayeh has not conceded that he was driving this fast, nor does it seem he has ever admitted to speeding at all.

[3] Again, El-Bayeh has never conceded he was speeding.  On July 22, 2024, the Massachusetts Department of Transportation ("MassDOT") increased the speed limit to sixty-five MPH.  Doc. No. 24 ¶ 157.

Add. 2

On September 21, 2021, El-Bayeh filed another suit challenging the legality of the fifty-five MPH speed limit, this time in the Middlesex County Superior Court. Doc. No. 24 ¶ 141; see Doc. No. 24-9 (operative complaint). He named as defendants MassDOT; "Jonathan Gulliver, in his individual and official capacity as Highway Administrator of [MassDOT]; Colleen Ogilvie, in her individual and official capacity as Registrar of Motor Vehicles; [MSP]; Christopher S. Mason, in his individual and official capacity as Colonel of [MSP]; [and] Michael P. Sierra, in his individual capacity." Doc. No. 24-9 at 2, ¶¶ 4–10. El-Bayeh asserted eleven claims for relief, including six claims under 42 U.S.C. § 1983 and one requesting declaratory judgment that the promulgated fifty-five MPH speed limit is void. Id. ¶¶ 171–205. The Middlesex Superior Court dismissed all claims on April 13, 2023, and El-Bayeh again unsuccessfully appealed. Doc. No. 24 ¶¶ 145–146; see Doc. No. 24-10; El-Bayeh v. Mass. Dep't of Transp., 238 N.E.3d 830 (Table) (Mass. App. Ct. 2024), appeal denied, 245 N.E.3d 1040 (Table) (Mass. 2024).

Following the SJC's denial of review, El-Bayeh attempted to further stay the appellate proceedings challenging the citation itself, stating there was "newly available evidence supporting a prima facie claim of selective prosecution." Doc. No. 24-13 at 4 (emphasis in original). In support of this request, he submitted to the MAC a spreadsheet he had created illustrating all 421 written warnings for speeding reported by Sierra between July 1, 2019, and October 14, 2024. Id. at 12–13; Doc. No. 24-15 at 23–28. El-Bayeh included in the spreadsheet the difference between the posted speed limit and the reported speed of each violator, finding the average difference was sixteen MPH. Doc. No. 24-13 at 12–13. El-Bayeh did not submit similar data for citations issued by Sierra assessing fines for speeding (instead of mere warnings) in the same time period. The MAC denied a further stay on February 5, 2025. Doc. No. 24 ¶ 190.

3

Add. 3

El-Bayeh filed his initial complaint with this Court on February 27, 2025, then filed yet another motion to stay with the MAC the following day.  Id. ¶ 192; Doc. No. 1.  The latter request was denied on March 3, 2025, and the MAC proceedings remain pending.  Doc. No. 24 ¶¶ 193–194; see also Doc. No. 24-17.

The "newly available evidence" referenced by El-Bayeh concerns two traffic stops made by Sierra in the fourteen months following El-Bayeh's most recent stop.  On March 30, 2022, Sierra stopped a vehicle driven by Daniel J. Snow along U.S. Route 3 in Bedford, Massachusetts.[4]  Doc. No. 24 ¶ 34.  Snow was wearing a jacket with a patch that read "MIDDLESEX SHERIFF'S OFFICE" on his left sleeve.  Id. ¶ 38.  Sierra informed Snow that he was stopped because he was going ninety-five MPH, but after running a check on Snow's license and registration, he issued Snow a written warning without a fine.  Id. ¶¶ 41, 44–46.  On October 2, 2022, Sierra stopped Thomas Blair on Route 2 in Littleton, Massachusetts.[5]  Id. ¶ 63.  Blair wore a baseball cap embroidered with the abbreviation "LFD," and when Sierra asked Blair where he worked, Blair replied: "Lincoln Fire Department."  Id. ¶¶ 67, 70.  Sierra told Blair that he had been stopped for driving eighty-six MPH in a fifty-five MPH zone, but again issued a written warning without a fine after running a check on Blair's license and registration.  Id. ¶¶ 71, 73.  El-Bayeh alleges the reason Sierra did not assess a fine against Snow or Bair was their affiliation with governmental entities.[6]  Id. ¶¶ 55, 82.

---

[4] The footage from Sierra's body-worn camera is available here: https://youtu.be/C2qVqxZ4xRc. Doc. No. 24 ¶ 36.

[5] The footage from Sierra's body-worn camera is available here: https://youtu.be/v_x2Yy2sI4I. Doc. No. 24 ¶ 65.

[6] El-Bayeh alleges that he "is not and has never been a member of law enforcement or a fire department."  Doc. No. 24 ¶ 30.  He has not alleged that this fact was known to Sierra at the time of the traffic stop.

4

Add. 4

On May 19, 2025, El-Bayeh filed an amended complaint with this Court, asserting claims

against the following defendants:

> Geoffrey D. Noble, in his official capacity as Colonel of the [MSP]; Michael P.
> Sierra, in his individual capacity and official capacity as a uniformed member of
> the [MSP]; Jonathan Gulliver, in his official capacity as Highway Administrator of
> the [MassDOT]; Colleen Ogilvie, in her official capacity as Registrar of Motor
> Vehicles; [and] Marian T. Ryan, in her official capacity as Middlesex County
> District Attorney.[7]

Id. at 1; see also id. ¶¶ 15–20.

El-Bayeh brings three claims under the Fourteenth Amendment and 42 U.S.C. § 1983.

Id. ¶¶ 202, 209, 215.  The first is for selective enforcement under the Equal Protection Clause,

alleging Sierra treated El-Bayeh worse than "other similarly situated individuals" due to their

"affiliation with a governmental entity."  Id. ¶¶ 201–207.  El-Bayeh also asserts a selective

prosecution claim, alleging Sierra deprived him of his right to equal protection by giving

"favorable treatment [to] other similarly situated individuals . . . based on an arbitrary

classification—affiliation with a governmental entity."  Id. ¶¶ 208–213.  Finally, El-Bayeh

brings a procedural due process claim against Defendant Gulliver for allegedly "fail[ing] to

provide El-Bayeh with fair notice . . . that the fifty-five [MPH] regulatory speed zone on U.S.

Route 3 was enforceable."  Id. ¶¶ 214–219.

Along with monetary damages from Sierra individually, El-Bayeh seeks declaratory

judgments in his favor, and both preliminary and permanent injunctions "prohibiting [the]

Defendants from taking any future enforcement or prosecutorial action against El-Bayeh . . .

from the alleged August 4, 2021[,] speeding violation."  Id. at 42–43.  The defendants move to

---

[7] Though named in the original complaint, MSP was omitted from the Amended Complaint.
Compare Doc. No. 1 at 1, with Doc. No. 24 at 1.  In this Order, the Court refers to all five named
defendants, to the extent they are sued in their official capacities, as "the Commonwealth
Defendants."  Only Sierra is also sued in his individual capacity.

Add. 5

dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to

state a claim under Fed. R. Civ. P. 12(b)(6).[8] See Doc. Nos. 17, 21, 29, 36.

## II.    LEGAL STANDARD

Jurisdictional issues must be decided before delving into any questions of fact or law.

Bell v. Hood, 327 U.S. 678, 682 (1945); see also Ne. Erectors Ass'n of BTEA v. Sec'y of Lab.,

Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995) ("When faced with

motions to dismiss under both 12(b)(1) and 12(b)(6), a district court . . . should ordinarily decide

the 12(b)(1) motion first."). Since immunity acts as "a limitation on the federal court's judicial

power," Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998), immunity doctrines are often

deemed jurisdictional questions appropriately addressed first, Mulero-Carrillo v. Román-

Hernández, 790 F.3d 99, 105 (1st Cir. 2015). Dismissal is appropriate when "the facts alleged in

the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." Muniz-

Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). The party invoking federal jurisdiction

(here, El-Bayeh) has "the burden of proving its existence." Jonson v. Fed. Deposit Ins. Corp.,

877 F.3d 52, 56 (1st Cir. 2017) (citation modified).

To survive a Rule 12(b)(6) challenge, a complaint must state sufficient factual matter

that, when accepted as true, establishes a facially plausible claim for relief. Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009). The complaint must set forth "factual allegations, either direct or

inferential, respecting each material element necessary to sustain recovery under some actionable

legal theory." Courtemanche v. Motorola Sols., Inc., 774 F. Supp. 3d 289, 310 (D. Mass. 2025)

(quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Claims are considered

---

[8] The defendants also invoke res judicata, based on the Middlesex County Superior Court suit asserting claims arising out of the same traffic stop. See Doc. No. 24-9. Since El-Bayeh's claims are subject to dismissal under Rules 12(b)(1) and 12(b)(6), the Court need not evaluate res judicata here.

Add. 6

facially plausible where a court can draw a "reasonable inference that the defendant is liable for the misconduct alleged." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678).  A claim must have a likelihood greater than a mere possibility to be plausible, and determining plausibility is a context-specific task that requires courts to draw on "judicial experience and common sense." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (quoting Iqbal, 556 U.S. at 679).

III.    DISCUSSION

A.    The Commonwealth Defendants

El-Bayeh's claims against the Commonwealth Defendants are barred by the doctrine of sovereign immunity.  "Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," Monell v. Dept. of Soc. Servs. of N.Y.C., 436 U.S. 658, 690 n.55 (1978), "a suit against a state official in his or her official capacity . . . is a suit against the official's office" that is "no different from a suit against the State itself," Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)).  It is settled that "a State is not a 'person' against whom a [42 U.S.C.] § 1983 claim for money damages might be asserted." Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 617 (2002) (citing Will, 491 U.S. at 66).  Nor did Congress intend to abrogate sovereign immunity under the statute. Buckley v. Fitzsimmons, 509 U.S. 259, 268 (1993); Tenney v. Brandhove, 341 U.S. 367, 376 (1951).  Therefore, the Commonwealth Defendants generally enjoy sovereign immunity against suits brought against them in federal court in their official capacities.

El-Bayeh contends that the Ex parte Young exception to sovereign immunity applies here.  Doc. No. 38 at 3–5; Doc. No. 45 at 5.  Under this exception, state officials who have taken unconstitutional actions to enforce state law maintain immunity from retrospective relief but may

7

Add. 7

be subject to injunctions awarding prospective relief. Ex parte Young, 209 U.S. 123, 159–60 (1908); accord Edelman v. Jordan, 415 U.S. 651, 665–66 (1974). To determine whether the exception applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (citation modified). Where there is no ongoing violation by state officials, "there is no prospective or ancillary relief to grant." Cotto v. Campbell, 126 F.4th 761, 768 (1st Cir. 2025), petition for cert. filed, No. 24-1307 (June 18, 2025).

El-Bayeh's alleged harm cannot be characterized as "ongoing" for the purpose of the Ex parte Young exception, even assuming he was harmed by a violation of federal law during the traffic stop. The First Circuit recently addressed this principle. In Cotto, the plaintiffs sought an order requiring the Commonwealth to return property the SJC had determined was wrongfully forfeited. 126 F.4th at 765. Notwithstanding the Commonwealth's potential "continuing liability for a past harm," the First Circuit found no ongoing violation of federal law arising from the failure to return the property. Cotto, 126 F.4th at 769. The same reasoning applies here. El-Bayeh alleges an ongoing violation of federal law because he "continues to be in jeopardy of being coerced to remit the imposed assessment and suffer the associated collateral penalties based on this unconstitutional claim against him." Doc. No. 38 at 4. In other words, he still must pay the fine he was assessed in the past, and he may suffer adverse collateral consequences if he fails to do so. Even if El-Bayeh's constitutional rights were violated during the traffic stop, he does not plausibly allege an ongoing violation of federal law by the Commonwealth Defendants. Any "continuing liability" of Sierra or other government officials "for a past harm" does not transform actions to enforce the citation and recover the assessed fine into an ongoing

8

Add. 8

constitutional violation.  The <u>Ex parte Young</u> exception thus cannot be applied here to circumvent sovereign immunity.

One final point bears mention.  El-Bayeh can mitigate any "associated collateral penalties" he fears will arise from his failure to pay the assessed fine.  If he exhausts all appeals and is nevertheless found responsible for the ticket, he may avoid license suspension or contempt <u>by paying the fine</u>.  Plaintiffs, including those with § 1983 claims, have a general duty to mitigate their damages.  <u>E.g.</u>, <u>Bogan v. City of Bos.</u>, 489 F.3d 417, 428 (1st Cir. 2007).  El-Bayeh may do so here—and, were he to plausibly state a claim against Sierra or another defendant challenging the lawfulness of the stop and then prevail on the merits of that claim, he could recover the fine he paid as a part of his damages.

Because sovereign immunity prevents El-Bayeh from obtaining monetary damages or other retrospective relief against the Commonwealth Defendants, and because El-Bayeh has not plausibly alleged an ongoing violation of federal law, this Court lacks subject-matter jurisdiction over nearly all of his claims.  The motions to dismiss are ALLOWED as to all claims asserted against the Commonwealth Defendants.

> B. <u>Sierra in his Individual Capacity</u>

All that remains are El-Bayeh's selective prosecution and enforcement claims against Sierra in his individual capacity.[9]  These claims must also be dismissed for failure to state a claim.

---

[9] El-Bayeh's claim for a due process violation is not plausibly alleged against Sierra in his individual capacity.  Sierra is not responsible for the promulgation of speed limits, and nothing in El-Bayeh's pleading plausibly alleges otherwise.

El-Bayeh has failed to plausibly allege a violation of his Constitutional rights.[10] Plaintiffs stating a claim for relief under 42 U.S.C. § 1983 must "establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999); accord Lindke v. Freed, 601 U.S. 187, 194 (2024); Pike v. Budd, 133 F.4th 74, 83 (1st Cir. 2025); Yaghoobi v. Tufts Med. Ctr., Inc., 762 F. Supp. 3d 85, 92 (D. Mass. 2025). Section 1983 creates no rights of its own; instead, "it merely provides remedies for deprivations of rights established elsewhere." City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985). The first element of any claim brought under § 1983 is thus "whether the plaintiff has been deprived of a right secured by the Constitution and laws of the United States." Martinez v. California, 444 U.S. 277, 284 (1980) (citation modified). "[A] violation of state law[] is not inherently sufficient to support a § 1983 claim." Boveri v. Town of Saugus, 113 F.3d 4, 7 (1st Cir. 1997); accord Durand v. Harpold, 807 F.3d 392, 394 (1st Cir. 2015).

El-Bayeh argues he was denied equal protection of the laws because Sierra denied him the "favorable treatment" Sierra afforded "other similarly situated individuals . . . based on an arbitrary classification—affiliation with a governmental entity." Doc. No. 24 at 39–40. But "affiliation with a governmental entity" is not a suspect class, nor does it implicate a fundamental right under the Constitution, so classification on this basis would not trigger heightened scrutiny.

---

[10] This finding supports dismissal for two reasons. First, the claims fail to withstand Sierra's Rule 12(b)(6) challenge. And second, Sierra would likely enjoy qualified immunity without a plausible allegation of a constitutional violation. See Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (describing two-step qualified immunity inquiry asking "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation" (citation modified)). The Court limits its discussion in the text to Rule 12(b)(6), which straightforwardly warrants dismissal.

Add. 10

See S.A. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973) (stating traditional indicia of suspect class is history of political powerlessness); see also United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938) (noting "discrete and insular minorities" are classes that are entitled to heightened scrutiny); cf. Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313 (1976) (per curiam) (holding right of governmental employment is not fundamental). As such, any equal protection claims on this classification would be subject to rational basis review. Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 24 (2020) (Gorsuch, J., concurring) (per curiam) ("Rational basis review is the test this Court normally applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right." (emphasis in original)).

To state a claim that succeeds under rational basis review, El-Bayeh must plausibly allege that Sierra's decision to ticket him was not "rationally related to a legitimate governmental interest." U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973); accord United States v. Montijo-Maysonet, 974 F.3d 34, 44 (1st Cir. 2020). Here, his allegations show the opposite. The Commonwealth of Massachusetts undoubtedly has a legitimate interest in ensuring traffic safety within its jurisdiction. Ry. Express Agency, Inc. v. N.Y., 336 U.S. 106, 109 (1949); accord Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 80 (1st Cir. 2025). The question that remains, then, is whether Sierra's decision to assess a fine against El-Bayeh in the circumstances as El-Bayeh describes them was rationally related to this interest.

The answer is a resounding yes, even under the plaintiff-friendly Rule 12 standard. In El-Bayeh's own words, Sierra stopped him "because [Sierra] believed [he] was driving seventy-two [MPH] in a fifty-five [MPH] zone." Doc. No. 24 ¶ 23. The mere observation of El-Bayeh driving seventeen MPH above the posted speed limit reasonably warrants a stop and a citation.

11

Add. 11

Cf. Mass. Gen. Laws ch. 90, § 17 (codifying speeding as prima facie evidence of violating Massachusetts traffic laws).  Stopping a driver in those circumstances is plainly and rationally related to the Commonwealth's interest in maintaining traffic safety.  The decision to fine a motorist is just as rationally related to that interest, particularly where a record check reveals a driving history with the same kind of infraction on the same highway once before.  In these circumstances, El-Bayeh has not plausibly alleged Sierra violated his right to equal protection under the Fourteenth Amendment.[11]

El-Bayeh's selective prosecution and enforcement claims against Sierra are implausible for a second reason: he has failed to plausibly allege that he is similarly situated to Snow and Blair.  El-Bayeh contends they are similarly situated in all regards, except in their affiliation with a governmental entity.  Doc. No. 24 ¶ 206.  But simply saying this does not make it so.  El-Bayeh cites to United States v. Lewis, 517 F.3d 20, 27 (1st Cir. 2007), to define "similarly situated" offenders as those who have "committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."  But Lewis itself stresses a focus on "material prosecutorial factors," or those factors that "have some meaningful relationship either to the charges at issue or to the accused—and that might be considered by a reasonable prosecutor."  Id.  Here, such a material factor is squarely conceded in El-Bayeh's own pleadings and sets him apart from the comparators he describes—El-Bayeh's driving record.

During a traffic stop, police officers may perform "ordinary inquiries incident to the stop," such as "checking the driver's license and inspecting the automobile's registration and

---

[11] The only other authority El-Bayeh cites in alleging Sierra abused his enforcement or prosecutorial discretion is buried in an exhibit.  There, El-Bayeh alleges Sierra's conduct violated Mass. Gen. Laws ch. 90C, § 2.  Doc. No. 24-13 at 22.  But Sierra's alleged state-law violation does not fall within the orbit of § 1983.  See Sullivan, 526 U.S. at 49–50.

Add. 12

proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015) (citation modified). It hardly needs saying that a motorist's driving record, revealed by "checking the driver's license," would be a relevant (and important) factor in an officer's assessment of whether to prosecute an alleged speeding offense. Cf. Commonwealth v. Rodriguez, 37 N.E.3d 611, 619 (Mass. 2015) (establishing "clear and compelling" government interest in allowing traffic stops for purpose of promoting public safety); United States v. Burleson, 657 F.3d 1040, 1046 (10th Cir. 2011) (stating background check may be run during traffic stop even if motorist's history is irrelevant to stop). El-Bayeh's driving record was blemished at least by his 2018 citation for traveling more than forty MPH over the speed limit, on the same highway where he was stopped by Sierra. Doc. No. 24-9 ¶ 89. El-Bayeh has not alleged that Snow or Blair had a driving record that was similarly blighted. This further dooms his equal protection claims against Sierra.

By failing to sufficiently allege a violation of his constitutional rights, El-Bayeh has failed to state a claim against Sierra upon which relief may be granted. Sierra's motion to dismiss is therefore ALLOWED with respect to the selective prosecution and enforcement claims against him in his individual capacity.

IV.    CONCLUSION

For the foregoing reasons, Sierra's Motion to Dismiss (Doc. No. 16) and the Commonwealth Defendants' Motion to Dismiss (Doc. No. 20) are ALLOWED. El-Bayeh's Motion for a Preliminary Injunction (Doc. No. 37) is DENIED as moot. The Clerk shall enter a separate judgment of dismissal and close this case. Each party shall bear their own fees and costs.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

13

Add. 13

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**


**Mikhael El-Bayeh**

        Plaintiff,

                      CIVIL ACTION NO. 1:25-10476-LTS

    V.


**Massachusetts Department of State Police et al**

        Defendants.

## ORDER OF DISMISSAL


Sorokin, D. J.


      In accordance with the Court's ORDER ON MOTIONS TO DISMISS, Dkt, No. 53, dated December 18, 2025, it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.


                    By the Court,


12/18/2025                   /s/ Flaviana de Oliveira
    Date                      Deputy Clerk

Add. 14

# Statutes, Rules & Regulations

Each police chief shall issue citation books to each permanent full-time police officer of his department whose duties may or will include traffic duty or traffic law enforcement, or directing or controlling traffic, and to such other officers as he at his discretion may determine. Each police chief shall obtain a receipt on a form approved by the registrar from such officer to whom a citation book has been issued. Each police chief shall also maintain citation books at police headquarters for the recording of automobile law violations by police officers to whom citation books have not been issued. The executive office of public safety and security shall promulgate rules and regulations establishing the standards required by this section for the issuance of electronic citations, including the proper equipment to be maintained by each department. In lieu of issuing citation books or in addition thereto, each police chief whose department issues citations electronically may grant authority to do so to each police officer of his or her department who has been trained pursuant to the regulations promulgated pursuant to this section.

Each police chief appointed by the trustees of the commonwealth's state universities and community colleges under section 22 of chapter 15A shall certify to the registrar, on or before January first of each year, that:

(1) the police officers appointed by the trustees at the state university or community college have been certified pursuant to chapter 6E;

(2) said officers have completed the annual in-service training required by the municipal police training committee established in section 116 of chapter 6;

(3) the state university or community college police department submits uniform crime reports to the Federal Bureau of Investigation;

(4) a memorandum of understanding has been entered into with the police chief of the municipality wherein the state university or community college is located outlining the policies and procedures for utilizing the municipality's booking and lock-up facilities, fingerprinting and breathalyzer equipment if the state university or community college police department does not provide booking and lock-up facilities, fingerprinting or breathalyzer equipment; and

(5) the state university or community college police department has policies and procedures in place for use of force, pursuit, arrest, search and seizure, racial profiling and motor vehicle law enforcement.

Nothing in this section, except the previous paragraph, shall limit the authority granted to the police chiefs and police officers at the state universities and community colleges under said section 22 of said chapter 15A or section 18 of chapter 73.

Notwithstanding the provisions of any general or special law, other than a provision of this chapter, to the contrary, any police officer assigned to traffic enforcement duty shall, whether or not the offense occurs within his presence, record the occurrence of automobile law violations upon a citation, filling out the citation and each copy thereof as soon as possible and as completely as possible and indicating thereon for each such violation whether the citation shall constitute a written warning and, if not, whether the violation is a criminal offense for which an application for a complaint as provided by subsection B of section three shall be made, whether the violation is a civil motor vehicle infraction which may be disposed of in accordance with subsection (A) of said section three, or whether the violator has been arrested in accordance with section twenty-one of chapter ninety. Said police officer shall inform the violator of the violation and shall give a copy of the citation to the violator. Such citation shall be signed, manually or

electronically, by the police officer, and whenever a citation is given to the violator in person that fact shall be so certified by the police officer. If a written warning is indicated, no further action need be taken by the violator. No other form of notice, except as provided in this section, need be given to the violator.

A failure to give a copy of the citation to the violator at the time and place of the violation shall constitute a defense in any court proceeding for such violation, except where the violator could not have been stopped or where additional time was reasonably necessary to determine the nature of the violation or the identity of the violator, or where the court finds that a circumstance, not inconsistent with the purpose of this section to create a uniform, simplified and non-criminal method for disposing of automobile law violations, justifies the failure. In such case the violation shall be recorded upon a citation as soon as possible after such violation and the citation shall be delivered to the violator or mailed to him at his residential or mail address or to the address appearing on his license or registration as appearing in registry of motor vehicles records. The provisions of the first sentence of this paragraph shall not apply to any complaint or indictment charging a violation of section twenty-four, twenty-four G or twenty-four L of chapter ninety, providing such complaint or indictment relates to a violation of automobile law which resulted in one or more deaths.

At or before the completion of his tour of duty, a police officer to whom a citation book has been issued and who has recorded the occurrence of an automobile law violation upon a citation shall deliver to his police chief or to the person duly authorized by said chief all remaining copies of such citation, duly signed, except the police officer's copy which shall be retained by the police officer; provided, however, that if a citation has been issued electronically, an electronic record shall be made and delivered to the police chief. If the police officer has directed that a written warning be issued, the part of the citation designated as the registry of motor vehicles record shall be forwarded forthwith by the

police chief or person authorized by him to the registrar and shall be kept by the registrar in his main office.

If the police officer has not directed that a written warning be issued and has not arrested the violator, the police chief or a person duly authorized by him shall retain the police department copy of each citation or, if issued electronically, shall retain the police department report of the issuance, and not later than the end of the sixth business day after the date of the violation:

(a) in the case of citations issued from a citation book alleging only one or more civil motor vehicle infractions, shall cause all remaining copies of such citations to be mailed or delivered to the registrar or, in the case of citations issued electronically alleging a civil motor vehicle infractions, shall ensure that such citations are electronically forwarded as required; or

(b) in the case of citations alleging one or more criminal automobile law violations, shall cause all remaining copies or electronic records of such citations to be delivered to the clerk-magistrate of the district court for the judicial district where the violation occurred. Failure to comply with the provisions of this paragraph shall not constitute a defense to any complaint or indictment charging a violation of section twenty-four, twenty-four G or twenty-four L of chapter ninety if such violation resulted in one or more deaths. Each clerk-magistrate shall maintain a record in the form prescribed by the chief justice of the district court department of such citations and shall notify the registrar of the disposition of such citations in accordance with the provisions of section twenty-seven of said chapter ninety.

If a citation issued from a citation book is spoiled, mutilated or voided, it shall be endorsed with a full explanation thereof by the police officer voiding such citation, and shall be returned to the registrar forthwith and shall be duly accounted for upon the audit sheet for the citation book from which said citation was removed. If any record of a

citation issued electronically is spoiled, mutilated or voided, the record of such electronic citation, to the extent it can be recovered, shall be endorsed with a full explanation thereof by the police officer voiding such electronic citation and it shall be forwarded to the registrar in a manner approved by the registrar and the officer shall be prepared to account for the void in an electronic audit trail.

# Mass. Gen. Laws ch. 90C, § 3

*Issuance of citations; hearing; appeal; summons or warrant; complaint; trial; license or permit suspension.*

*Effective: July 1, 2019.*

(A) (1) If a police officer observes or has brought to the officer's attention the occurrence of a civil motor vehicle infraction, the officer may issue a written warning or may cite the violator for a civil motor vehicle infraction in accordance with this subsection. If the officer issues a citation solely for one or more civil motor vehicle infractions without any associated criminal violations, the officer shall indicate on the citation the scheduled assessment for each civil motor vehicle infraction alleged.

(2) The citation shall notify the violator that within twenty days of the date of the citation the violator must, for each civil motor vehicle infraction alleged, either pay the scheduled assessment or contest responsibility for the infraction by requesting a noncriminal hearing before a magistrate of the district court.

(3) The violator shall pay the assessment indicated by the officer for each such infraction within twenty days of the date of the citation: (a) by mailing the total amount of the indicated assessment, along with the citation appropriately marked, to the registrar at the address indicated on the citation, or (b) by delivering, personally or through an agent duly authorized in writing, the total amount of the indicated assessment, along with the citation appropriately marked, to any office of the registrar during normal business hours. Payment may be made in such forms, including payment by credit card or other recognized form of electronic payment, as the registrar shall determine.

Payment of the indicated assessment shall operate as a final disposition of the matter. The violator shall not be required to report to any probation officer, and no record of the matter shall be entered in any

criminal or probation records of any court. The payment of the indicated assessment shall not be admissible as an admission of guilt, responsibility or negligence in any criminal or civil proceeding, except that such payment shall be an admission of responsibility and shall operate as a conviction for purposes of any action by the registrar pursuant to chapter ninety and for purposes of the safe driver insurance plan established by section one hundred and thirteen B of chapter one hundred and seventy-five.

(4) A violator may contest responsibility for the infraction by making a signed request for a noncriminal hearing on the citation and mailing such citation, together with a $25 court filing fee, to the registrar at the address indicated on the citation within 20 days of the citation. Notwithstanding any general or special law to the contrary, the registrar, in cooperation with the state comptroller, upon receipt of the $25 court filing fee, shall cause the court filing fee to be transferred to the trial court department; provided, however, that the registrar may periodically retain an amount necessary to pay refunds of said fees for dispositions that result in findings of not responsible; and provided further, that the registrar may retain an amount not greater than $200,000 annually for personnel costs associated with the processing of those filing fees.

A violator who does not, within twenty days of the date of the citation, request a noncriminal hearing shall not thereafter be given such a hearing, unless the registrar shall determine that the failure to make such a request timely was for good cause that was not within the control of the violator. The registrar's determination of such issue shall be final.

The registrar shall notify the clerk-magistrate of the district court for the judicial district in which the infraction occurred of such request for a noncriminal hearing, in such manner as the chief justice of the district court department and the registrar shall jointly determine. Unless a hearing date and time has already been assigned pursuant to procedures jointly established by the chief justice of the district court department and the registrar, the clerk-magistrate shall notify the police

agency concerned and the violator of the date and time of the hearing before a magistrate of the court.

If the hearing is conducted by a magistrate other than a justice, either the violator or the police agency concerned may appeal the decision of the magistrate to a justice, who shall hear the case de novo. Any violator so appealing the decision of a magistrate shall be responsible for paying a fee of $50 prior to the scheduling of the appeal hearing before a justice. There shall be no right of jury trial for civil motor vehicle infractions.

In any such hearing before a magistrate or justice, the citation shall be admissible and shall be prima facie evidence of the facts stated therein. Compulsory process for witnesses may be had by either party in the same manner as in criminal cases. On a showing of need in advance of such hearing, the magistrate or justice may direct that the violator be permitted to inspect specific written documents or materials in the possession of the police officer or agency concerned that are essential to the violator's defense.

At the conclusion of the hearing, the magistrate or justice shall announce a finding of responsible or not responsible. The magistrate or justice shall enter a finding of responsible if it was shown by a preponderance of the credible evidence that the violator committed the infraction alleged; otherwise the magistrate or justice shall enter a finding of not responsible, which shall be communicated to the registrar. No other disposition shall be permitted, and such matters shall not be continued without a finding, dismissed, or filed.

If the violator is found responsible after a noncriminal hearing, the magistrate or justice shall require the violator to pay to the registrar an assessment which shall not exceed the scheduled assessment for that infraction. Such assessment shall be in accordance with any guidelines promulgated by the chief justice of that department of the trial court, which shall be binding on magistrates and justices, to the end that such

assessments are made as uniformly as possible, and which may include provisions requiring a prescribed or a minimum assessment for specified civil motor vehicle infractions.

The violator shall pay to the registrar the assessment imposed by the magistrate or justice within twenty days of the date the violator is personally notified or is mailed notice of the decision of the magistrate or justice, unless for good cause the magistrate or justice allows the violator a longer time to pay the imposed assessment.

The violator's obligation to pay such imposed assessment shall automatically be stayed during the pendency of any timely appeal to the appellate division or any subsequent appeal to an appellate court. The violator shall be required to pay such imposed assessment to the registrar within twenty days of the date the appellate division or the appellate court renders a decision that is adverse to the violator and that has not been further appealed.

(5) Questions of law arising in the disposition of a civil motor vehicle infraction in a noncriminal hearing before a justice may be appealed to the appellate division. Such appeals shall be governed by a simplified method of appeal established by rules promulgated by the chief justice of the district court department, subject to the approval of the supreme judicial court. Claims of appeal shall be accompanied by an entry fee in an amount established by the chief justice of the trial court. Proceedings under this chapter shall not be reviewable by a civil action in the nature of certiorari.

(6) (a) If a violator:

(i) fails either to pay the full amount of the scheduled assessment to the registrar or to request a noncriminal hearing within twenty days of the date of the citation plus such grace period as the registrar shall allow, or

(ii) fails to appear for a noncriminal hearing before a magistrate or a justice at the time required after having been given notice of such hearing either personally or by first class mail directed to such violator's mail address as reported to the registrar and after notice of such failure has been given to the registrar by the clerk-magistrate, the registrar shall notify such violator by first class mail directed to such violator's mail address that unless and until the violator pays to the registrar the full amount of the scheduled or imposed assessments for such civil motor vehicle infractions, plus any late fees or other administrative fees provided for by law or regulation:

(i) in the case of an operator violation, such violator's operators license, learners permit or right to operate will be suspended by operation of law and without further notice or hearing at the expiration of thirty days from the date of the mailing of such notice, and any license to operate a motor vehicle issued to such violator by the registrar will not be renewed upon or after the expiration date of such license; or

(ii) in the case of an owner violation, any registration of a motor vehicle issued to such violator will be suspended by operation of law and without further notice or hearing at the expiration of thirty days from the date of the mailing of such notice, and any registration of a motor vehicle issued to such violator by the registrar will not be renewed upon or after the expiration date of such registration.

Unless such notice is sooner cancelled by the registrar, in the case of an operator violation, such violator's operators license, learners permit or right to operate, or in the case of an owner violation any registration of a motor vehicle issued to such violator by the registrar, shall be deemed suspended by operation of law on the date indicated on the notice mailed by the registrar, and shall remain suspended until reinstated by the registrar upon payment of the scheduled or imposed assessments for such civil motor vehicle infractions, plus any late fees or other administrative fees which the registrar is required or authorized by law or regulation to impose, unless such fees are waived in whole or in part by the registrar.

(b) If a violator attempts to pay a scheduled assessment with a check, credit card, debit card, or any other payment method that is returned unpaid or rejected, or fails to pay the full amount of an assessment imposed by a magistrate or justice pursuant to this section within the time allowed plus such grace period as the registrar shall allow, the registrar shall revoke any operator's license, learner's permit, certificate of registration or title, number plate, sticker, decal or other item issued by the registrar and held by the violator and order the return thereof forthwith. Such violator may not apply for or receive any operators license, learners permit, certificate of registration or title, number plate, sticker, decal or other item issued by the registrar until such amount has been paid in full, plus any late fees or other administrative fees which the registrar is required or authorized by law or regulation to impose, unless such fees are waived in whole or in part by the registrar.

(c) Payment of a scheduled assessment or an assessment imposed by a magistrate or justice pursuant to this section, plus any late fees or other administrative fees provided for by law or regulation, shall operate as a final disposition of the matter. The violator shall not be required to report to any probation officer, and no record of the matter shall be entered in any criminal or probation records of any court.

(B) (1) If a police officer observes or has brought to the officer's attention the occurrence of an automobile law violation that constitutes a criminal offense, the police officer: (a) may direct that a written warning be issued; (b) may arrest the violator without a warrant in accordance with the provisions and limitations of section twenty-one of chapter ninety for such offenses as are specified in that section; or (c) may determine that an application for criminal complaint shall be filed.

(2) If the police officer determines that an application for criminal complaint shall be filed, the officer shall so indicate on the citation. The citation shall notify the violator that a violator accused of a misdemeanor, with no accompanying felony, will be granted a hearing before such

Add. 26

complaint issues, as provided in section thirty-five A of chapter two hundred and eighteen, if the violator so requests in writing within four days of the violation to the clerk-magistrate of the district court for the judicial district where the offense occurred. Such notification on the citation shall satisfy the notice requirements of section thirty-five A of chapter two hundred and eighteen.

The citation shall serve as the application for criminal complaint, supplemented if necessary with such additional information as shall be required by the administrative justice of the district court department. If a criminal complaint is issued, the procedure established for criminal cases shall then be followed. Each police chief may, from time to time, designate one person to sign all such complaints.

(3) If a violator in the case of a citation which alleges one or more criminal automobile law violations:

(a) fails without good cause to appear in court as required after having been summonsed or after having been given notice to appear either personally or by first class mail directed to such person's mail address as reported to the registrar, or such person's last known address as furnished by such person to the citing officer or to the court; or

(b) fails to pay within the time allowed the full amount of a fine, penalty, assessment, or other lawful amount required by a justice pursuant to law; or

(c) attempts to pay such fine, penalty, assessment, or other lawful amount with a check that is returned, unpaid, the clerk-magistrate shall notify the registrar. Such notice to the registrar may be given more than once in the same case if necessary.

Upon receipt of such notice, the registrar shall revoke any operators license, learners permit, certificate of registration or title, number plate, sticker, decal or other item issued by the registrar and held by the violator and order the return thereof forthwith. Such violator may not

Add. 27

apply for or receive any operators license, learners permit, certificate of registration or title, number plate, sticker, decal or other item issued by the registrar unless and until the violator presents the registrar with a certificate of the clerk-magistrate of the court that the matter has been fully disposed of in accordance with law or, in the case of a matter still pending before the court, that the violator is attending to the matter to the satisfaction of the court. The court shall not unreasonably withhold such certificate. The registrar may cancel such revocation, and so notify the court, if satisfied that it resulted through error of the registrar or the court.

Nothing herein shall limit the availability to the court of other enforcement mechanisms in addition to notice to the registrar, including the issuance of additional written notices, summonses or warrants, including warrants of distress as provided for in section forty-two of chapter two hundred and seventy-nine, or proceedings for civil or criminal contempt. Civil contempt actions shall be prosecuted by the district attorney or police prosecutor and heard by a justice pursuant to rules of court. Any summons or warrant issued pursuant to this subsection may be served by any officer authorized to service criminal process.

(C) If a violator is cited for a civil motor vehicle infraction in conjunction with and arising from the same occurrence as an automobile law violation that constitutes a criminal offense, both shall be recorded on the same citation whenever feasible, in a format acceptable to the district court, and all parts of the citation shall be deposited with the clerk-magistrate as provided in section two.

The civil motor vehicle infraction shall retain its character as such and shall be decided and disposed of under the same general procedures and with the same provisions as to disposition and assessments as provided in subsection (A), with the following exceptions:

(1) The violator may not dispose of the civil motor vehicle infraction by paying the scheduled assessment to the registrar until there has been an adjudication of the associated automobile law violation.

(2) The violator may request a noncriminal hearing on such civil motor vehicle infraction by making a written request therefor at any time prior to the commencement of trial on the associated criminal automobile law violation. Such noncriminal hearing shall be conducted by a justice, and either may be conducted simultaneously with the criminal trial, or may be severed from the trial of the associated criminal automobile law violation if justice so requires. If the violator exercises the right to trial by jury in the first instance with respect to the associated criminal automobile law violation, the noncriminal hearing shall be conducted by the justice presiding over such trial.

(3) If the violator has been found guilty of, and is simultaneously being sentenced on, the criminal automobile law violation, the justice may order filed without imposition of an assessment any associated civil motor vehicle infraction as to which the violator admits responsibility or has been found responsible. In all other cases, if the violator admits responsibility or has been found responsible for the civil motor vehicle infraction, the justice shall require the violator to pay a civil assessment in accordance with subsection (A). Such civil assessment shall be paid directly to the registrar, or shall be paid to the clerk-magistrate and then paid over to the registrar, as the registrar and the chief justice of the district court shall jointly determine.

If the violator in such a case defaults solely on the portion of such citation that constitutes one or more civil motor vehicle infractions, such default shall be dealt with as indicated in subsection (A). If the violator in such a case defaults on the portion of such citation that constitutes one or more criminal automobile law violations, such default shall be dealt with as indicated in subsection (B).

**Mass. Gen. Laws ch. 90C, § 10**

*Penalty for falsification or disposal of citation, copy or record of issuance.*

Whoever knowingly falsifies a citation or copies thereof or a record of the issuance of same, or disposes of such citation, copy, or record, in a manner other than as required by the provisions of this chapter, or attempts so to falsify or dispose, or attempts to incite or procure another so to falsify or dispose shall be punished by a fine of not more than five hundred dollars or by imprisonment for a term not to exceed one year, or both such fine and imprisonment.

**Mass. Gen. Laws ch. 268, § 6A**

*False written reports by public officers or employees.*

Whoever, being an officer or employee of the commonwealth or of any political subdivision thereof or of any authority created by the general court, in the course of his official duties executes, files or publishes any false written report, minutes or statement, knowing the same to be false in a material matter, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

**Mass. Gen. Laws ch. 268A, § 23**

*Supplemental provisions; standards of conduct.*

*Effective: September 29, 2009.*

(a) In addition to the other provisions of this chapter, and in supplement thereto, standards of conduct, as hereinafter set forth, are hereby established for all state, county, and municipal employees.

(b) No current officer or employee of a state, county or municipal agency shall knowingly, or with reason to know:

(1) accept other employment involving compensation of substantial value, the responsibilities of which are inherently incompatible with the responsibilities of his public office;

(2) (i) solicit or receive anything of substantial value for such officer or employee, which is not otherwise authorized by statute or regulation, for or because of the officer or employee's official position; or (ii) use or attempt to use such official position to secure for such officer, employee or others unwarranted privileges or exemptions which are of substantial value and which are not properly available to similarly situated individuals;

(3) act in a manner which would cause a reasonable person, having knowledge of the relevant circumstances, to conclude that any person can improperly influence or unduly enjoy his favor in the performance of his official duties, or that he is likely to act or fail to act as a result of kinship, rank, position or undue influence of any party or person. It shall be unreasonable to so conclude if such officer or employee has disclosed in writing to his appointing authority or, if no appointing authority exists, discloses in a manner which is public in nature, the facts which would otherwise lead to such a conclusion; or

(4) present a false or fraudulent claim to his employer for any payment or benefit of substantial value.

(c) No current or former officer or employee of a state, county or municipal agency shall knowingly, or with reason to know:

(1) accept employment or engage in any business or professional activity which will require him to disclose confidential information which he has gained by reason of his official position or authority;

(2) improperly disclose materials or data within the exemptions to the definition of public records as defined by section seven of chapter four, and were acquired by him in the course of his official duties nor use such information to further his personal interest.

(d) Any activity specifically exempted from any of the prohibitions in any other section of this chapter shall also be exempt from the provisions of this section. The state ethics commission, established by chapter two hundred and sixty-eight B, shall not enforce the provisions of this section with respect to any such exempted activity.

(e) Where a current employee is found to have violated the provisions of this section, appropriate administrative action as is warranted may also be taken by the appropriate constitutional officer, by the head of a state, county or municipal agency. Nothing in this section shall preclude any such constitutional officer or head of such agency from establishing and enforcing additional standards of conduct.

(f) The state ethics commission shall adopt regulations: (i) defining substantial value; provided, however, that substantial value shall not be less than $50; (ii) establishing exclusions for ceremonial privileges and exemptions; (iii) establishing exclusions for privileges and exemptions given solely because of family or friendship; and (iv) establishing additional exclusions for other situations that do not present a genuine risk of a conflict or the appearance of a conflict of interest.

**940 Mass. Code Regs. § 37.04(1), (12)–(13)**

*Requirements for Disclosure (excerpt).*

*Effective: January 5, 2024.*

(1) Any information or record disclosed pursuant to St. 2022, c. 81, § 7 may only be disclosed consistent with the Registrar's functions under federal and state law and not for the purpose of enforcing federal immigration law or provided to an agency that primarily enforces immigration law, unless the Registrar is provided with a lawful court order or judicial warrant signed by a judge appointed pursuant to Article III of the United States Constitution, a federal grand jury or trial subpoena, or as otherwise required by federal law. When responding to such an order, warrant, or subpoena, the Registrar may only disclose those records or information specifically requested in the order, warrant, or subpoena.

Upon the Registrar's receipt of a lawful court order, judicial warrant, or subpoena, the Registrar shall, prior to disclosing the records or information and no later than three business days after receipt of such request, make reasonable efforts to notify the individual about whom such information was requested, informing such individual of the request and the identity of the agency that made such request, unless disclosure would impede a criminal investigation.

(12) Nothing in 940 CMR 37.00 shall be interpreted to authorize the designation as a public record of any information provided by or relating to:

(a) the applicant for a Massachusetts license;

(b) the applicant for a learner's permit;

(c) the holder of a Massachusetts license; or

(d) the holder of a learner's permit.

Add. 34

(13) Notwithstanding 940 CMR 37.04(12), the Registrar may release the following Registry and Merit Rating Board data as a public record, provided that all personal information and highly restricted personal information, as defined in 18 U.S.C. § 2725, and all information required to be shielded under M.G.L. c. 90, § 30, have been redacted;

(a) vehicle information, such as vehicle inspection data, titles, VIN numbers, and license plate numbers, provided that the data does not, through ordinary means, identify a license or permit applicant, or a license or permit holder; and

(b) documents provided to the Registrar by state or local government agencies, so long as these documents would have been considered public records before they were provided to the Registrar.

# St. 2022, c. 81, § 7

*An Act Relative to Work and Family Mobility.*

*Effective: July 1, 2023.*

(a) Notwithstanding any general or special law to the contrary, any information provided by or relating to an applicant for a Massachusetts license under section 8 of chapter 90 of the General Laws or a learner's permit under section 8B of said chapter 90, including failure to provide proof of lawful presence as defined in section 1 of said chapter 90, including, but not limited to, personally identifying information and communications between the applicant and the registrar of motor vehicles pursuant to said sections 8 or 8B of said chapter 90, shall neither be a public record nor be disclosed by the registrar, except as required by federal law or as authorized by regulations promulgated by the attorney general; provided, however, that information maintained by the motor vehicle insurance merit rating board pursuant to section 57A of chapter 6C of the General Laws may be disseminated for motor vehicle insurance purposes; and provided further, that any information disseminated for motor vehicle insurance purposes shall remain confidential and be used solely for the purpose of motor vehicle insurance.

(b) Notwithstanding any general or special law to the contrary, any information provided by or relating to the holder of a Massachusetts license issued under said section 8 of said chapter 90 or the holder of a learner's permit issued under said section 8B of said chapter 90, including failure to provide proof of lawful presence as defined in said section 1 of said chapter 90, including, but not limited to, personally identifying information and communications between the holder and the registrar of motor vehicles pursuant to said sections 8 or 8B of said chapter 90, shall neither be a public record nor be disclosed by the registrar, except as required by federal law or as authorized by regulations promulgated by the attorney general; provided, however,

that information maintained by the motor vehicle insurance merit rating board pursuant to said section 57A of said chapter 6C may be disseminated for motor vehicle insurance purposes; and provided further, that any information disseminated for motor vehicle insurance purposes shall remain confidential and be used solely for the purpose of motor vehicle insurance.

# Trial Court Rule VII

*Uniform Rules on Civil Motor Vehicle Infractions.*

*Effective: July 1, 1986.*

(a) Scope of Rule. This rule shall be applicable in the Boston Municipal Court, District Court and Juvenile Court Departments. This rule governs (1) the procedure for the determination of responsibility for civil motor vehicle infractions, in accordance with G.L. c. 90C, § 3, at hearings conducted by clerk-magistrates, de novo hearings conducted by judges, and hearings held by judges where the civil motor vehicle infraction has arisen from the same occurrence as a criminal automobile law violation cognizable under G.L. c. 90C, § 3(B); (2) the procedure for civil contempt in civil motor vehicle infraction cases; and (3) appeal under G.L. c. 90C, § 3(A) of issues of law arising from the decisions of judges in civil motor vehicle infraction cases. Such appeal is available following adjudication by judges in cases heard on appeal following a clerk-magistrate's finding and disposition, and in cases where the civil motor vehicle infraction arose from the same occurrence as a criminal motor vehicle violation cognizable under G.L. c. 90C, § 3(B). This rule shall be construed and applied to secure the prompt and informal determination of civil motor vehicle infractions.

(b) Hearings.

(1) General. When conducted by a clerk-magistrate, hearings on civil motor vehicle infractions, other than in juvenile proceedings, shall take place in a room to which the public has access. When conducted by a judge on appeal or in conjunction with a criminal violation, such hearings shall be held in a courtroom. The judge or clerk-magistrate shall inform the parties that he is conducting a non-criminal hearing on an

alleged civil motor vehicle infraction. Counsel may participate in such hearings.

All witnesses shall be placed under oath. The rules of evidence shall not apply at such hearings. The evidence shall be given such weight as the judge or clerk-magistrate deems appropriate. Questioning and cross-examination of witnesses shall proceed to the extent and in the manner determined appropriate by the judge or clerk-magistrate, provided, however, that a party shall not be denied the opportunity to present relevant evidence or cross-examine witnesses.

Hearings on civil motor vehicle infractions shall not be delayed or postponed except for good and sufficient reason.

(2) Finding and Disposition. At the conclusion of the hearing, the judge or clerk-magistrate shall announce a finding and disposition of "not responsible" or "responsible". The judge or clerk-magistrate shall enter a finding of "not responsible" if he determines that it was not shown, by a preponderance of the credible evidence, that the alleged violator committed the infraction charged. If the judge or magistrate determines by a preponderance of the credible evidence that the alleged violator did commit the infraction charged, he shall enter a finding of "responsible" and impose an assessment which shall be within the range permitted by law and in accordance with any applicable guidelines that have been promulgated pursuant to law. No other disposition shall be permitted. No disposition may be suspended and no costs shall be assessed, except that after a finding of "responsible" the judge or clerk-magistrate may continue the proceeding for a limited time to permit the violator to pay the assessment imposed. No case shall be continued without a finding or filed, and no person shall be subject to any terms of probation or any other requirement; provided, however, that if the violator has been found guilty and is simultaneously being sentenced upon a criminal motor vehicle violation that arose from the same occurrence as one or more civil motor vehicle infractions, the judge may order any other civil motor vehicle infractions to be filed without imposition of an assessment.

(3) Appeal of Clerk-Magistrate's Finding and Disposition. Claim of appeal to a judge from a clerk-magistrate's finding and disposition shall be made upon the clerk-magistrate's announcement of the finding and disposition, and shall be noted on the citation. There shall be no filing fee for such appeal.

(c) Complaint for Contempt.

(1) General. Upon (1) failure of a person who has received a citation for a civil motor vehicle infraction to either make timely payment of the appropriate civil assessment or notify the court that he wishes to contest the infraction in accordance with G.L. c. 90C, or (2) failure or refusal of such person to pay such assessment after being found responsible, within the time allowed, or (3) failure of such person, without good cause, to appear for a hearing on a civil motor vehicle infraction, a judge of the court may issue, at the request of the District Attorney or police prosecutor or clerk-magistrate, or sua sponte, a complaint for civil contempt against such person. Such complaint shall be on a form prescribed therefor, and shall indicate the failure or refusal that is the basis for the contempt charge.

(2) Summons. Upon the signing of the complaint by the District Attorney, by the officer involved or by a designated officer of the police department involved, or, in the case of a complaint requested by the clerk-magistrate or ordered issued by a judge, by the clerk-magistrate, the court shall forthwith issue a summons to the person so charged, together with a copy of the complaint, requiring said person to appear before the court on a date certain to explain the reasons for such failure or refusal as set forth in the complaint.

(3) Service. The summons and copy of complaint shall be served by first-class mail or by any officer authorized to serve criminal process, as provided by law. Service by said officer shall be made in hand or by leaving a copy at the defendant's last and usual place of abode.

(4) Arrest Warrant. If the person fails, without good cause, to appear in response to the summons, and the court has satisfactory proof of service of said summons, an arrest warrant may be issued, and shall be served by any officer authorized to serve criminal process. Upon appearance in court on said warrant, the hearing on the civil contempt shall proceed.

(5) Hearing. Proceedings for civil contempt under this rule shall be prosecuted by the District Attorney or police prosecutor, pursuant to G.L. c. 90C, § 3(A), and heard by a judge. At the hearing in such cases, testimony shall be taken under oath. If the court determines by a preponderance of the credible evidence that the person's failure or refusal as alleged in the complaint did occur and is without good cause, the court shall adjudicate the defendant to have committed an act of civil contempt. If the court finds that the defendant did not commit an act of civil contempt, it shall forthwith proceed to make such order as is necessary for the disposition of the pending civil motor vehicle infraction.

(6) Disposition and Adjudication of Contempt. Upon entry of a finding that the defendant has committed an act of civil contempt, the court may, consistent with the court's determination of the defendant's ability to pay, order payment of an amount, in addition to any other sum then owed, to reimburse the Commonwealth or the appropriate political subdivision thereof for the reasonable expense related to the person's failure or refusal to act that constituted the contempt, together with an amount for the reasonable expense involved in prosecuting the contempt action, including cost of service. If necessary, the court, consistent with the court's determination of the defendant's ability to pay, shall commit such person so adjudicated in civil contempt to the county jail or house of correction until all amounts owed are paid or shall order such commitment and stay its execution for a reasonable time to allow such payment; provided, however, that juveniles shall be committed to the Department of Youth Services and incarcerated as provided by law. Such contempt shall be considered purged upon payment of all amounts owed.

(7) Other Actions. Procedure under this rule shall not be construed to exclude any other remedy otherwise available by law.

(8) Appeal of Contempt. Parties may appeal matters of law arising in a contempt proceeding to the appropriate Appellate Division.

(d) Appeal.

(1) Claim of Appeal. Claim of appeal to the appropriate Appellate Division shall be filed with the clerk-magistrate of the court in which the civil motor vehicle infraction was heard. Such claim of appeal shall be set forth in writing on the form provided therefor and shall state specifically the issue of law for which appellate review is sought. Such claim of appeal shall be filed no later than ten days following the entry of the court's determination of responsibility in the civil motor vehicle infraction case.

(2) Transmission of Papers to the Appellate Division. Upon receipt of a claim of appeal, the clerk shall promptly transmit a copy of it, together with copies of all papers in the case then on file, including the citation, front and back, to the appropriate Appellate Division.

(3) Notice From Appellate Division. Upon receipt of the case, the Appellate Division shall notify the parties of the right to submit written briefs on the legal issue or issues presented for review, and the date by which such briefs must be submitted. Said notice shall also indicate, where deemed necessary by the Appellate Division, that a review of the tape recordings of the proceedings, if such recording is available, will be required for proper appellate review, and in such cases, shall instruct the appellant to obtain a cassette copy of the tape in accordance with the applicable procedures and provide it to the Appellate Division by a date certain.

(4) Appellate Division Review. Appeals shall be reviewed and decided by the Appellate Division without oral argument unless the Appellate Division shall otherwise allow, and this shall also be indicated to the parties in the aforementioned notice. When oral argument is

allowed, the parties shall be informed reasonably in advance of the date, time, and place of such proceedings, and the time to be allowed for argument, which shall be in the discretion of the Appellate Division.

(5) Disposition by the Appellate Division. If, as a result of its resolution of a legal issue presented for appeal, the Appellate Division concludes that prejudicial error occurred in the civil motor vehicle infraction proceeding, it shall order the court's finding and disposition vacated, and shall order a new hearing held, consistent with its rulings on the legal issues that were the subject of the appeal, or the case dismissed or the violator found not responsible, whichever disposition it deems appropriate.

If the Appellate Division finds that no issue of law is presented or that no prejudicial error occurred, it shall affirm the adjudication of the court below.

Failure by the appellant to comply with these rules may be grounds for dismissal of the appeal.

The Appellate Division shall communicate its findings and its order, if any, to the parties and the clerk-magistrate of the court from which the appeal was taken. Upon receipt of said finding and order, said clerk shall take all other necessary action, including collection of any assessment or other charge the payment of which was stayed pending the appeal.

**Unpublished Decisions**

*Compelled attachments under Fed. R. App. P. 32.1(b).*

## *Crawford* v. *Blue*, No. 15-1545

*Judgment (1st Cir. Oct. 14, 2016) (unpublished).*

# United States Court of Appeals
## For the First Circuit

No. 15-1545

PETER A. CRAWFORD,

Plaintiff, Appellant,

v.

CELIA BLUE, individually and in her official capacity as the Massachusetts Registrar of Motor Vehicles; RACHEL KAPRIELIAN, individually and in her official capacity as the former Massachusetts Registrar of Motor Vehicles,

Defendants, Appellees

Before
Lynch, Thompson and Barron
<u>Circuit Judges</u>.

**JUDGMENT**

Entered: October 14, 2016

Peter Crawford filed this 42 U.S.C. § 1983 action in the District of Massachusetts against Rachel Kaprielian and Celia Blue, two former Massachusetts Registrars of Motor Vehicles, in their individual and official capacities. In relevant part, Crawford alleges that the Registrars violated his federal procedural due process rights by requiring him to pay a non-refundable $25 court filing fee as a precondition to challenging his $140 speeding citation in a state district court in accordance with Mass. Gen. L. c. 90C, § 3.

The district court dismissed the complaint "save for the violation of procedural due process," ruling that Crawford had stated a cause of action "because, however this breaks down, you're out $25 just to get a hearing." Following discovery, however, the court granted summary judgment for the defendants from the bench. It observed that the Massachusetts process for contesting civil motor vehicle infractions is evenhanded--everyone but the indigent "has to pay [$25] for the proces[s] which is due"--and that "the state has a legitimate interest in discouraging frivolous appeals and conserving its judicial resources."

On appeal, Crawford "agrees that the process for challenging the $140 [citation] is constitutionally adequate except for the $25 . . . 'filing fe[e].'"  In his view, "[t]he $25 exaction violates due process because there is no notice and opportunity for a hearing prior to the final deprivation" of the $25.  "The issue is not whether there is a fundamental right of 'cost free access to the courts,' as defendants argue[d below] . . . but rather whether a person may be deprived of his money, a traditional property interest undeniably within the plain language of the Due Process Clause," without notice or an opportunity to be heard.  According to Crawford, the district court "failed to conduct a <u>Mathews</u> weighing" of the competing due process interests[1] and failed to consider "substitute procedural safeguards such as imposing costs only after a motorist is found responsible, or refunding the filing fees paid by those who are not found responsible."

We think the judgment of the court was too summary in the circumstances.  The balancing test in <u>Mathews</u> calls for closer attention to each of three familiar factors, which the district court should revisit on remand at the summary judgment stage and in such further proceedings as may prove necessary:

--the private interest at stake, which, though small ($25), is a precondition to any hearing of the relatively "consequential" and "serious matte[r]" of traffic violations--which can potentially part a person from his or her license (or worse), <u>Gillespie</u> v. <u>City of Northampton</u>, 950 N.E.2d 377, 387 (Mass. 2011)--as hearings are available only in a judicial proceeding, upon payment of the filing fee, with no apparent opportunity for prior administrative review;

--the risk of an erroneous deprivation of such interest through the appeals procedure used--concerning which Crawford seems to have sought discovery of statistical evidence--and the probable value of additional or substitute procedural safeguards; and

--the Commonwealth's interest, including the function involved and the fiscal and administrative burdens of any additional or substitute procedural safeguards.  In this final regard, we note that for decades "[b]efore July 1, 2009, no fee was required to challenge a [traffic] citation before a clerk-magistrate," <u>Police Dept. of Salem</u> v. <u>Sullivan</u>, 953 N.E.2d 188, 191 (Mass. 2011); and that in Massachusetts, there are cost-free avenues to be heard initially for parking violations that are issued in the "several million[s]."  <u>Gillespie</u>, 950 N.E.2d at 381, 384-85.

We take no view as to how the <u>Mathews</u> balancing test should come out or what remedy (if any) might be warranted.  Nor do we take any view as to the related suspension of Crawford's operating privileges.  The judgment of the district court is <u>vacated</u> for further proceedings consistent with this judgment.

By the Court:

<u>/s/ Margaret Carter, Clerk</u>

---

[1] Under <u>Mathews</u> v. <u>Eldridge</u>, 424 U.S. 319, 334-35 (1976), the court must appropriately accommodate the importance of the private interest; the likelihood of governmental error; and the magnitude of the governmental interests involved.

cc:
Hon. William G. Young
Robert Farrell, Clerk, United States District Court for the District of Massachusetts
Peter A. Crawford
Douglas S. Martland

**Dep't of State Police v. El-Bayeh, 106 Mass. App. Ct. 1128**

*Memorandum and Order Pursuant to Rule 23.0 (Mass. App. Ct. Mar. 27, 2026) (unpublished).*

NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-675

DEPARTMENT OF STATE POLICE

vs.

MIKHAEL H. EL-BAYEH.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a de novo hearing, a judge of the District Court found the defendant, Mikhael El-Bayeh, responsible for the civil motor vehicle infraction of speeding, G. L. c. 90, § 17.  El-Bayeh appealed to the Appellate Division, which affirmed the District Court judge's finding of responsibility.  El-Bayeh now appeals, arguing, among other things, that (1) the de novo hearing judge (hearing judge) erred by denying El-Bayeh's motion to dismiss the speeding citation and (2) the motion judge (motion judge) erred by denying El-Bayeh's motion to permit inspection of written documents and materials in possession of the Department of State Police (department) that he argues were essential to his defense.  We reverse the decision and order of

Add. 50

the Appellate Division and remand for entry of an order vacating the District Court's finding of responsibility.

Background. 1. Procedural history. On August 4, 2021, a State trooper issued El-Bayeh a citation for speeding, which El-Bayeh appealed to a clerk-magistrate of the District Court. The clerk-magistrate found El-Bayeh responsible for the infraction. El-Bayeh then requested a de novo appeal to a judge of the District Court.

Prior to the hearing, El-Bayeh moved for, among other things, discovery. His motion was denied. We reserve for later discussion the discovery El-Bayeh sought. Following the de novo hearing, the hearing judge found El-Beyah responsible. El-Bayeh then appealed to the Appellate Division, which affirmed the finding of responsibility.

2. Statement of facts. We summarize the evidence presented at the de novo hearing at which State Trooper Michael Sierra testified and El-Bayeh, who represented himself, presented his case. On August 4, 2021, at approximately 6:30 P.M., the trooper was parked in the ramp area connecting Interstate Highway 95 and Route 3 in Burlington. It was slightly raining and cloudy, and the "roadways were slightly damp." The trooper heard an "engine sounded to be at full throttle," and when he looked up, he saw a gray Subaru Forester

"flying past" him at the top of the ramp.  The trooper visually estimated that the vehicle was traveling fifty miles per hour and accelerating, whereas other cars on the ramp were traveling at roughly thirty miles per hour.  As the Forester accelerated past the trooper, he retrieved his light detection and ranging (LIDAR)[1] device.  The trooper visually estimated that the Forester was by then traveling at seventy-five miles per hour, and the LIDAR device measured a speed of seventy-two miles per hour.  The vehicle was traveling in a zone with a posted speed limit of fifty-five miles per hour.  The trooper stopped the vehicle, identified the operator as El-Bayeh, and issued a citation.

During the hearing, El-Bayeh objected to the introduction of LIDAR evidence, and he cross-examined the trooper about how the trooper visually estimated the speed of El-Bayeh's vehicle. During the trooper's testimony, El-Bayeh moved to dismiss on the grounds that the citation was not entered into evidence.  The hearing judge denied the motion to dismiss, found El-Bayeh responsible, and imposed a fine of $105.  El-Bayeh appealed to

---

[1] "'Lidar,' a portmanteau of 'light' and 'radar,' refers to '[a]n optical sensing technology used to determine the position, velocity, or other characteristics of distant objects by analysis of pulsed laser light reflected from their surfaces'" (citation omitted). Commonwealth v. Crowder, 495 Mass. 552, 554 n.3 (2025).

the Appellate Division, which affirmed the de novo judge's finding of responsibility.

Discussion. 1. Motion to dismiss. El-Bayeh asserts that the hearing judge erred in denying his motion to dismiss because the trooper did not introduce a copy of the traffic citation into evidence and, therefore, the department did not show probable cause that he was speeding, and the department did not satisfy the "no-fix" law, G. L. c. 90C, § 2. We disagree.

First, because the trooper testified that he observed El-Bayeh speeding, the trooper had probable cause to believe that El-Bayeh committed a civil motor vehicle infraction. See Commonwealth v. Lobo, 82 Mass. App. Ct. 803, 808-809 (2012) (trooper's "immediate observation that none of [a vehicle's] occupants was wearing a seat belt provided a basis to cite . . . all the vehicle's occupants . . . for a seat belt law violation"); Commonwealth v. Zimmermann, 70 Mass. App. Ct. 357, 359 (2007) (trooper's visual observations provided probable cause that defendant was operating his motor vehicle at rate of speed that was greater than reasonable or prudent).

Second, we discern no error in the hearing judge's conclusion that the department complied with G. L. c. 90C, § 2, the "no fix" statute, which generally requires a law enforcement officer "to give a copy of the [traffic] citation to the

violator at the time and place of the violation."  Id.  Here,

the trooper testified that he gave a paper citation to El-Bayeh

during the traffic stop.  Contrast Commonwealth v. Carapellucci,

429 Mass. 579, 581 (1999) (complaint dismissed pursuant to G. L.

c. 90C, § 2, where Commonwealth conceded that no copy of motor

vehicle citation was ever mailed or delivered to defendant).  We

are not persuaded by El-Bayeh's argument that the best evidence

rule required a copy of the citation to be introduced into

evidence because the rules of evidence do not apply at hearings

on civil motor vehicle infractions.[2]  Rule VII(b)(1) of the Trial

Court Rules, Uniform Rules on Civil Motor Vehicle Infractions

(1986).  Thus, the hearing judge did not err in denying El-

Bayeh's motion to dismiss.[3]

---

[2] Even if the rules of evidence did apply at the de novo
hearing, the best evidence rule was inapplicable because the
purpose of the trooper's testimony on this issue was not to
prove the contents of the citation; it was to prove that he gave
the citation to El-Bayeh.  See Commonwealth v. Balukonis, 357
Mass. 721, 725 (1970) ("The best evidence rule is applicable to
only those situations where the contents of a writing are sought
to be proved").

[3] We also reject El-Bayeh's argument that Trial Court Rule
VII(d)(2) required the de novo judge to review a copy of the
citation to find probable cause.  See rule VII(d)(2) of the
Trial Court Rules, Uniform Rules on Civil Motor Vehicle
Infractions ("Upon receipt of a claim of appeal, the clerk shall
promptly transmit a copy of it, together with copies of all
papers in the case then on file, including the citation, front
and back, to the appropriate Appellate Division").  On its face,
rule VII(d)(2) governs the transmission of materials to the
Appellate Division and does not prescribe what evidence must be

2.  <u>Motion for discovery</u>.  Prior to the hearing on the de novo appeal, El-Bayeh filed a motion "to permit inspection of written documents, materials, and/or potentially exculpatory evidence."  El-Bayeh requested to inspect (1) the LIDAR unit used by the trooper to measure the speed of El-Bayeh's vehicle; (2) the LIDAR unit's storage area; (3) the user manual for the LIDAR unit; and (4) the site where the LIDAR unit was last tested by the trooper before issuing the speeding citation at issue -- in this case, the trooper's backyard.  The department opposed the motion, arguing that El-Bayeh failed to establish that the requested materials were relevant to demonstrate that the LIDAR device was inaccurate or defective.  Following a hearing on El-Bayeh's motion, the motion judge denied the motion "for the reasons set forth in the Department of State Police's opposition."

El-Bayeh is correct that pursuant to G. L. c. 90C, § 3 (A) (4), fifth par., he is entitled to at least some

-----

presented to a judge conducting a de novo hearing in the District Court.  Though it would have been the better practice for the department to introduce a copy of the citation into the record, this administrative rule does not set an evidentiary requirement.  The hearing judge could conclude from the trooper's testimony alone that there was probable cause to issue a speeding citation to El-Bayeh.  See rule VII(b)(1) of the Trial Court Rules, Uniform Rules on Civil Motor Vehicle Infractions (at hearings on civil motor vehicle infractions, "[t]he evidence shall be given such weight as the judge or clerk-magistrate deems appropriate").

discovery, however, that determination is left to the motion judge in the first instance.  The statute provides that "[o]n a showing of need in advance of [a civil motor vehicle infraction] hearing, the magistrate or justice may direct that the violator be permitted to inspect specific written documents or materials in the possession of the police officer or agency concerned that are essential to the violator's defense."  G. L. c. 90C, § 3 (A) (4), fifth par.  Fundamentally, while the rules of evidence do not apply at hearings on civil motor vehicle infractions, the judge or clerk-magistrate must preserve the alleged violator's right to a fair hearing.  See Commonwealth v. Mongardi, 26 Mass. App. Ct. 5, 9 (1988) ("the procedure with respect to civil motor vehicle infractions authorized by [G. L.] c. 90C, §§ 1-3, . . . seeks to attain prompt compliance with government regulations while preserving the right to a fair hearing").[4]

Given that the department intended to -- and ultimately did -- rely in part on LIDAR evidence to prove that El-Bayeh had been speeding, written documents and materials relevant to the reliability of the LIDAR unit were "essential" to his defense.

---

[4] After Mongardi, the Legislature rewrote c. 90C, § 3, to expressly allow for discovery in advance of hearings on civil motor vehicle infractions.  G. L. c. 90C, § 3, as amended through St. 1991, c. 138, § 161.

G. L. c. 90C, § 3 (A) (4), fifth par.  El-Bayeh argued in his

motion that inspection of the LIDAR unit user manual could help

him cross-examine the trooper about whether the device was

properly stored and calibrated on the day of the incident.

Moreover, while the department did not object to this request it

did not provide the user manual.  Similarly, records of the

calibration of the unit are essential to determine whether the

unit was properly calibrated.  Where production of this

discovery could have assisted El-Bayeh in challenging the

admissibility of the LIDAR reading or in cross-examining the

trooper, and where such production would not have unduly

burdened the department, it was an abuse of discretion for the

motion judge not to allow this discovery.[5]

As for El-Bayeh's requests to inspect the LIDAR unit, the

storage area, and the testing site, those requests must be

evaluated in light of any written discovery that is ordered

consistent with this memorandum and order.  In that context, the

motion judge will be better equipped to evaluate and balance the

parties' competing interests and whether such discovery is

---

[5] While the trooper did bring the State police LIDAR guide
with him to the hearing and the hearing judge offered to pause
the hearing to allow El-Bayeh time to inspect it, he maintained
his objection because this did not allow him to prepare before
the hearing.

essential to El-Bayeh's defense.  Here, El-Bayeh argued in his motion that inspection of the LIDAR unit would allow him to verify the existence and condition of the unit; inspection of the storage area would allow him to confirm if the device was properly stored according to the user manual; and inspection of the testing site, which was at the trooper's home, would allow El-Bayeh to examine if the site complied with the unit's pre-operational testing requirements.[6]

Simply put, El-Bayeh must be provided sufficient discovery to challenge the accuracy of the LIDAR unit.[7]  Commonwealth v. Whynaught, 377 Mass. 14, 18 (1979) ("most courts have agreed that the admission of radar evidence is conditioned on a demonstration to the court of the accuracy of the radar apparatus").  It also might be that after receiving the written discovery, El-Bayeh may no longer need the additional discovery,

---

[6] For example, the hearing judge should factor in that El-Bayeh has independently learned and confirmed the trooper's home address so the confidentiality of that information is no longer at issue.

[7] Of course, if the department elects to proceed without the use of LIDAR evidence, this discovery will not be necessary. "[L]ike many lay witnesses who directly observe a motor vehicle while it is moving, a police officer is likely to be qualified to offer an estimate of the speed of that vehicle." Peterson v. Foley, 77 Mass. App. Ct. 348, 351 (2010).  We express no opinion on the sufficiency of the non-LIDAR evidence to support a finding of responsibility.

or that his interests may be served by examining photographs of the LIDAR unit, where it was stored, and where it was calibrated.

Conclusion. Because the hearing judge may have relied upon LIDAR evidence in finding El-Bayeh responsible,[8] we are constrained to reverse the decision and order of the Appellate Division and remand to the Appellate Division for entry of an order vacating the District Court's finding of responsibility.[9]

So ordered.

By the Court (Rubin, Henry & Wood, JJ.[10]),

Clerk

Entered:  March 27, 2026.

---

[8] Given our disposition, we need not reach the issue of whether the evidence obtained from the LIDAR device was admissible.  We also decline to reach the issue because the evidence may differ at any hearing after remand.

[9] El-Bayeh's request for a refund of his filing fees pursuant to G. L. c. 90C, § 3 (A) (4), first par., is denied. That provision allows a refund when the disposition on appeal results in a finding of not responsible, which has not occurred here.

[10] The panelists are listed in order of seniority.